UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-20822-CR-WILLIAMS/TORRES(s)

UNITED STATES OF AMERICA

v.

JESUS MANUEL MENOCAL, JR.
_____/

**GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE
PURSUANT TO FEDERAL RULES OF EVIDENCE 413 AND 404(b)**

The United States hereby gives notice of its intent to introduce evidence pursuant to Federal

Rules of Evidence 413 and/or 404(b) regarding the defendant's other acts of sexual assault against

Victim 4 and Victim 5.   The United States also hereby gives notice of its intent to introduce

evidence pursuant to Rule 404(b) concerning (1) the defendant's sexual relationship with a student

trainee at the police academy where the defendant was an instructor; and (2) his actions in May

and June of 2015 in bringing a number of young women, after hours and on weekends, into a

Hialeah Police Department substation that was not staffed or open to the public.

**PROCEDURAL AND FACTUAL BACKGROUND**

On December 12, 2019, a federal grand jury returned an Indictment (DE: 3) charging the

defendant with two counts of willfully depriving victims of the right to be free from unreasonable

searches and seizures by a person acting under color of law, in violation of 18 U.S.C. §242.   Count

1 charges that on or about June 13, 2015, the defendant, for his own sexual gratification, directed

Victim 1 to remove her shorts and underwear and turn around.   Count 2 charges that during an

incident that occurred between January 1, 2015 and March 31, 2015, the defendant exposed his

1

bare penis to Victim 2, placed her hand on it, and kissed her.

On May 27, 2020, the government filed a Superseding Information (DE: 25), charging the defendant with violating 18 U.S.C. §242 by willfully depriving Victim 3 of that same right to be free from unreasonable searches and seizures by a person acting under color of law, during an incident that occurred on May 31, 2015.   In that incident, the defendant is charged with causing Victim 3's mouth to have contact with his penis.   On June 9, 2020, this Court consolidated the Indictment and Superseding Information for trial (DE: 29).

This case is currently set for trial beginning on November 9, 2020 (DE: 20).   The Court's Order Setting Pre-Trial Deadlines ("Pre-Trial Order"), directed the government to file any Rule 404(b) notices no later than August 3, 2020 (DE: 23 at ¶2).   On the unopposed motion of the government (DE: 33), this Court entered an Order extending the filing deadline to August 10, 2020 (DE: 35).   In compliance therewith, this Notice describes in summary fashion the government's potential Rule 404(b) and Rule 413 evidence.   If the government obtains or identifies any additional Rule 404(b) or Rule 413 evidence, it will promptly inform the defendant and file a supplemental notice.

As the Indictment and Superseding Information allege, the defendant was a police officer who criminally abused his power and position to obtain sexual gratification from a number of young women in violation of their Fourth Amendment right to be free from unreasonable searches and seizures.   At the time of the charged conduct, the defendant was a Sergeant with the Hialeah Police Department ("HPD") assigned to Sector 5 of the city of Hialeah.   In his position, the defendant worked in uniform and drove a marked HPD vehicle, and had keycard access to HPD Substation 5.   Substation 5 was a facility that was not regularly staffed or open to the public. Instead, access was limited to HPD personnel and those escorted by HPD personnel for limited

2

official HPD purposes.   The charged incidents involving Victim 1 and Victim 3 both took place inside Substation 5, while the charged incident involving Victim 2 took place in the evening in a deserted industrial-type area in Hialeah.   In all three of these incidents, the defendant was in uniform and armed when he unlawfully exercised his police authority over these young female victims for his own sexual gratification.

**Victim 1**

In 2015, Victim 1, who was 17 years old at the time, and her 20-year old girlfriend, N.N., were in financial need. They decided to post advertisements offering masseuse services on Backpage.   These ads included provocative photos of Victim 1, and while they included a disclaimer noting that no sex was involved, they were designed to create the contrary impression. Once a client responded and hired them, they would set up a time and place to meet.   Victim 1 and N.N. would drive to the location together, and then Victim 1 would meet with the client, collect the money, and bring it to N.N.   Once the money was collected, either they would leave the scene immediately or Victim 1 would provide a massage to the client without sex.

On Saturday, June 13, 2015, Victim 1 received a text message from a potential client, and arranged to meet him.   The client gave an address located in an industrial park in Hialeah, and pursuant to the client's instructions, Victim 1 and N.N. sent the client a text as they approached that location.   When they arrived, they felt uncomfortable because the location appeared desolate, so Victim 1 started to exit the parking lot.   As she attempted to drive out, a marked HPD vehicle drove into the lot, stopped directly in front of her vehicle, and blocked her from exiting.

The defendant, in uniform and armed, exited his vehicle, walked to the driver's side of the car, and asked Victim 1 for her license and registration.   He began questioning her about the large amount of clothing in the back of her car, and Victim 1 explained that she and N.N. were in the

process of moving in with N.N.'s mother.   Victim 1 truthfully told the defendant she was 17 and N.N. was 20.   The defendant asked Victim 1 to step out and led her to the trunk of the car, where he asked her several times "why are you doing this?"   In response to his question of why they were there, Victim 1 falsely stated that they were on their way to pick up N.N.'s paycheck.

The defendant told Victim 1 that his sergeant had asked him to pick her up.   He walked her to his police car and put her in the back seat without handcuffing or searching her.   The defendant told N.N. to drive Victim 1's car to the front of Substation 5, which was very close by, while he drove Victim 1 in his police car through the gate to the substation's back parking lot.

The defendant then brought Victim 1 into the substation by using a key card to enter the building's back door.   The defendant led Victim 1 down a long hallway and into a large room, and then into a smaller room.   The defendant locked the door to the small room, and as Victim 1 sat with her back to the wall, he sat on a chair about two feet in front of her.   He asked her for her address, which he wrote down in a notebook he pulled out of the desk in the room.   He then asked her a number of sexually oriented questions that he insisted she answer.

The defendant asked Victim 1 to stand up and turn around, telling her he wanted to look at her "ass," and threatened to arrest her if she did not remove her shorts and underwear.   She complied with this demand, and the defendant removed his gun belt, moved closer to her, and touched his genitals from outside his pants.   He next asked her to remove her shirt and bra. Fearful that he was going to rape her, Victim 1 declined in a forceful tone and told him that her girlfriend was waiting outside for her.   The defendant said "Oh, I though you wanted to fuck," and said she was lucky because he "was a cool cop."   He told her that she was free to go, and then brought her out the front door of the substation and told her not to return to Hialeah.

After she exited the building, Victim 1 got into the passenger's seat of her car while the

defendant spoke to N.N. near the front of the substation and returned Victim 1's driver's license to N.N.   As N.N. drove them away from the substation, the defendant followed their car in his marked unit and directed N.N. to turn on to the Florida Turnpike to leave the area.

**Victim 2**

Sometime in early 2015, while walking one evening from her mother's home to her then-boyfriend's home in Hialeah, Victim 2 observed the defendant standing by his gray marked Hialeah police truck.   Victim 2 was familiar with the defendant as she and her friends sometimes loitered at a particular fast food restaurant in Hialeah, she had encountered him there before, and everyone knew him as the HPD Sergeant in that area.   Shortly after seeing the defendant, Victim 2 saw two male friends parked in a car and she approached them, asking for a ride.   She entered their car and spoke to them for a few minutes, at which point the defendant drove up with activated lights and a siren.   The defendant told Victim 2 to exit the car and wait by his police truck and then he directed the two men to drive away.

The defendant instructed Victim 2 to meet him at the factories across the street.   Once there, he instructed Victim 2 to walk to an alley behind the building, where the defendant removed his gun belt, unzipped his pants, pulled out his penis, and started to masturbate.   He asked her to "help him out" and then he placed Victim 2's hand on his penis and moved it back and forth.

The defendant, who was over a foot taller than Victim 2, bent down, grabbed her, and began to kiss her and squeeze her breast over her bra.   He then asked her to turn around and remove her pants. She declined, telling him that she was on her period.   He tried to persuade her to remove her pants, but she refused in a more forceful tone, telling him she was in a hurry as her friends were waiting for her.   In response to her question, the defendant told her he was not arresting her but that she should not tell anyone about what had happened.   He then zipped up his

5

pants and placed his gun belt on his waist and they returned to his police truck, where she entered the back seat, and he dropped her off in the general area where he had first seen her.

Victim 2 did not report this incident to the authorities after it occurred in early 2015. However, after Victim 1 came forward and made her complaint to HPD in the evening of June 13, 2015, detectives from HPD's Professional Compliance Bureau (PCB) learned that the defendant also had sexually assaulted Victim 2.   Following up on this, they quickly located Victim 2 and interviewed her, and she told them about the defendant sexually assaulting her.   At some point after this interview, Victim 2 encountered the defendant after he arrived on the scene of a domestic disturbance involving Victim 2 and her then-boyfriend.   The defendant told them that he was aware they had reported the incident to PCB because he was sleeping with a female detective in that unit.   He also told them that they could not stop him, telling them "you can't kill a beast, you can't knock me down.   I'm a beast."

**Victim 3**

Around noon on May 31, 2015, Victim 3, who was 19 years old at the time, was riding in a car with her then-boyfriend, O.P., when she began expressing suicidal thoughts and trying to hurt herself by scratching at her neck and banging her head against the car window.   Concerned for her, O.P. drove to HPD Substation 5, where he asked officers for assistance.

A number of HPD officers responded to the Substation 5 parking lot, including the defendant, who came out of Substation 5 a few minutes after O.P. and Victim 3 arrived.   The officers detained O.P. in the back of a police car because he had cocaine and marijuana inside his vehicle.   The defendant and other HPD officers inspected the car and interacted in the parking lot with Victim 3, who was handcuffed.   At times, the defendant, who was much taller and larger physically than Victim 3, stood extremely close to Victim 3, making her feel uncomfortable.

6

At one point while the defendant was the only officer standing near Victim 3, he repeatedly asked her to perform oral sex on him in exchange for her release.   The defendant, however, did not have the discretion to release her because her behavior required that she be taken into custody pursuant to the Baker Act.   She ultimately acceded to the defendant's request, and the defendant then told her to ask to use the restroom.   Victim 3 complied with this direction even though she did not actually need to use it.   The defendant then walked Victim 3, in handcuffs, into Substation 5 by himself, taking her down a hallway and into an area outside the view of the substation's surveillance cameras.

Once in this isolated area with Victim 3, the defendant removed her handcuffs, unzipped his pants, and pulled out his penis.   The defendant adjusted his gun belt, but did not remove it, and then asked Victim 3 to grab his erect penis.   She began performing oral sex on him while the defendant placed his hands on the back of her head, moving it back and forth until he ejaculated. The defendant then re-handcuffed Victim 3 in the hallway and told her not to tell anyone what happened.   Ignoring Victim 3's questions about why he was not releasing her, the defendant brought her out of the substation and placed her, handcuffed, in the back seat of another marked unit.   Another HPD officer then transported her to a hospital for evaluation pursuant to the Baker Act at the direction of the defendant, who was the ranking officer on the scene.

## THE RULE 413 EVIDENCE

### The Evidence Regarding Victim 4

The evidence regarding the defendant's sexual assault of Victim 4 consists primarily of the testimony of Victim 4 along with limited testimony from Victim 4's mother.   Victim 4 will testify that sometime in late 2014 or very early 2015, when she was 14 years old, she was walking home one night when the defendant stopped her.   Victim 4 knew who the defendant was because he

previously warned or cited her and her friend for trespassing when they were loitering at local businesses, such as McDonald's.[1]   Because of the late hour, Victim 4 was in violation of her court-ordered curfew when she encountered the defendant, who was in civilian clothing but was driving his marked HPD-issued truck.   Victim 4 told the defendant that she was walking home, but he told her that he knew where she lived, and that she should get in his truck and he would take her home.   When she refused, the defendant told her that she was out after curfew and had to get in, so she complied.

After she got in the truck, the defendant drove deep into the Lago Grande neighborhood, heading in the opposite direction of her house.   He parked in a dark secluded area, got out of the truck, and told her to get out.   He then pulled down his pants and told her to perform oral sex on him.   When she refused, he told her that if she did not, he would take her to jail or would drive her somewhere and leave her stranded.   Faced with this threat from a police officer in a secluded, dark area, and not wanting to get into trouble, Victim 4 performed oral sex on the defendant as he demanded.

The defendant ejaculated on her shirt and Victim 4 ran away.   She ran to a lake inside the Lago Grande complex, wrapped her shirt around a rock, and threw it into the lake.[2]   Victim 4 then ran home and showered.   She did not tell anyone about the incident when it happened because she was scared of the defendant and ashamed of what he forced her to do.

Victim 4 first reported this incident to then-HPD Detective Byrd, who located and brought

---

[1] Victim 4 had behavioral issues prior to being assaulted by the defendant, resulting in her placement in foster care and being subject to a judicially ordered curfew.   Following the incident, Victim 4's legal issues escalated, and she has since had multiple encounters with the criminal justice system.

[2] Victim 4 was wearing a tank top and bra under her shirt.

her to an HPD police station after she had run away from her foster home.[3]   This occurred on June 17, 2015, after the press had reported on the incident involving the defendant and Victim 1 and the resulting ongoing HPD investigation.   Victim 4 also told the detective that her friend, Victim 2, previously had told her (Victim 4) about a similar incident with the defendant and then sent her a link to an article about the investigation of the defendant.[4]

Victim 4's mother will testify that she first learned of the defendant's sexual assault of her daughter when Det. Byrd told her about it on the evening of June 17, 2015.   She also will testify that she recalled that in November or December of 2014, around the same time that Victim 4 was sexually assaulted by the defendant, Victim 4 stopped going to school, was running away, and that in December of 2014, Victim 4 started cutting herself and was Baker Acted as a result.

### The Evidence Regarding Victim 5

The evidence regarding the defendant's sexual assault of Victim 5 consists primarily of the testimony of Victim 5, who was 19 years old when the incident occurred.   Victim 5 will testify that one night during the month of November 2014, she was walking from her home in Hialeah to the local gym where she worked out.   The gym, which she stated was known at the time as Porky's, but has since been renamed as Youfit, was not far from her home.[5]   She was walking there at some point after 10:00 p.m. when the defendant pulled up next to her in his marked HPD-

---

[3] Victim 4 has given multiple statements regarding this matter, including a sworn statement to HPD investigators, a forensic interview arranged by the HPD, and statements to the FBI.   The reports, transcripts, and recordings of these various statements have been provided to the defendant in discovery.   The description provided in this notice contains a summary of the information she provided and that is more fully contained in those statements and interviews.   Not surprisingly in this setting, where a 14-year old girl sexually assaulted by a police officer has been interviewed by multiple authorities over the last four years, there are inconsistencies regarding some of the details in her statements. However, the core essence of the claim is unchanged: the defendant used his police authority to force a 14-year old girl to perform oral sex on him.

[4] Victim 2 and Victim 4 subsequently had a falling out and no longer maintain any sort of friendship or contact.

[5] Notably, when he was arrested, the defendant had his Youfit membership identification with him.

issued police car.   He was in uniform and he asked her what she was doing.   Victim 5 did not

know the defendant, but he did introduce himself.   When Victim 5 explained she was walking to

the gym, the defendant informed her that it was not safe and offered to drive her there.   She

initially refused his offer, but he insisted and indicated that she was prowling the area and he would

not leave her there, changing his tone from concern to coercion.

Faced with this demand from a uniformed police officer, Victim 5 complied and got into

the defendant's police car.   She could see that the defendant was in full uniform, wearing his gun

belt with his holstered gun.   Although Victim 5 told the defendant where her gym was, he instead

drove in a different direction, ignoring her statement that he was going the wrong way, and ended

up in a deserted dark alley near Tootsie's Cabaret.   While the defendant was driving in a direction

heading away from the gym, and to this undisclosed location, Victim 5 sat silently in shock and

fear.

After the defendant parked the car in the dark alley, he got out of the car, stood in front of

her, and pulled down his pants.   He took Victim 5's head and neck in his hands and forced it to

his genital area, and holding onto her head, had her perform oral sex on him.   At some point while

she was in the defendant's car, Victim 5, fearing what was going to happen, started the recording

feature on her phone and left it on the seat, producing an audio recording of a portion of their

encounter.[6]

After having her perform oral sex, the defendant began pulling down Victim 5's pants, and

eventually he had sexual intercourse with her.   Victim 5 was not aware if the defendant ejaculated,

but only that he abruptly stopped.   He then pulled up his pants and told her to clean herself up,

---

[6] This recording, as well Victim 5's sworn statement to HPD about this incident and other subsequent interactions
with the defendant, and other relevant reports have been previously provided in discovery.

and only after they were back in the car did he ask Victim 5 her age, commenting that at age 19, she was "young."   Afraid and playing along at that point, Victim 5 engaged in apparently friendly sexual banter while he drove her back to a location near her home and dropped her off.

Victim 5 then went directly home.   She was very upset by what had occurred and told no one about it at that time.   She then encountered the defendant three more times over approximately the next month, culminating in a final time when he picked her up in his HPD-issued marked police truck and took her to a remote wooded area where they had sexual intercourse.   The two intervening brief encounters did not involve sex, but during one, the defendant saw her walking home from her job at a local Publix in Hialeah.   He stopped and gave her his card with his phone number, and obtained her phone number, and they began a series of friendly-appearing text messages, although throughout this time, Victim 5 was scared of the defendant, who knew where she lived and worked.

Victim 5 first reported this incident to the authorities after she saw media coverage of the defendant's arrest in this case.   At that point, she came forward and made a complaint about the defendant, giving a recorded sworn statement to HPD Professional Compliance Bureau detectives on December 16, 2019, describing in detail the sexual assault by the defendant summarized herein. However, because more than five years had passed by the time Victim 5 came forward, the statute of limitations for a violation of 18 U.S.C. §242 had expired.

### THE RULE 404(b) EVIDENCE

**The Evidence Relating to C.M.**

The evidence relating to C.M. will consist primarily of the testimony of C.M., a trainee at the Police Academy ("Academy") at Miami-Dade College's North Campus in the summer of 2017, a time when the defendant was assigned there by HPD to serve as an instructor and recruiter.   The

evidence also will include text and WhatsApp messages obtained from C.M. and other supporting records and documents, including records relating to the defendant's assignment to and tenure at the Academy.[7]   In summary, the evidence will establish that the defendant, despite the Academy's prohibition of sexual relationships between instructors and trainees, had an improper consensual sexual relationship with C.M.   When that affair came to light, the defendant, using his authority and superior position, pressured and coerced C.M. to lie to Academy instructors investigating their relationship, and to resign from the Academy.

C.M. will testify that she started at the Academy as a trainee in the summer of 2017. Unlike some trainees who are sent to the Academy by a police department after being hired, C.M. enrolled on her own in hopes of obtaining a job as a police officer upon graduation.   In his capacity as an instructor, the defendant had an improper consensual sexual relationship with C.M. Although consensual, the relationship was improper because the Academy did not permit sexual relations between instructors and trainees.

C.M. will testify that shortly after she started at the Academy, the defendant offered to help her obtain a job at HPD and they exchanged phone numbers so they could communicate more about this.   At the end of her first week, he texted her that he would tell her class leader that she was sick so that she could meet with him across from the Academy to discuss the application process.   When she went there, he told her to get in his car so they could talk, and they ended up having sex there.   They continued meeting several times a week to have sex before or after the Academy sessions.

The defendant went to great lengths to keep their relationship a secret.   These steps

---

[7] All of this evidence has been provided in discovery, including the reports of interviews of C.M., C.M.'s grand jury testimony, and the supporting documentation the government intends to offer on this issue.

included telling C.M. to use WhatsApp for their communications (which are not retained the same way text messages are); making her save his number in her phone as "Ana;" checking her phone to ensure it was in fact saved as "Ana;" and deleting messages between them from her phone.   He convinced her that it was in their best interest to keep their relationship a secret, and that she had the most at stake because she would never become a police officer if their sexual relationship was discovered.

C.M. eventually became pregnant with the defendant's child.   When she told him, the defendant was very upset and repeatedly pressured her to have an abortion, telling her "if you want to be a police officer, you can't have a baby right now."   He told her that if she told somebody about their relationship or the pregnancy, he would make sure that she never became a police officer and that he would call his connections from every department and tell them not to hire her. In addition, when C.M. learned that the defendant was married, he attempted to convince her to keep their affair secret by telling her that if it came out, his wife would leave him and it would destroy his family right after they had just had another child.

By mid-August, her classmates found out about her relationship with the defendant and complained to Academy leadership, and C.M. admitted the affair when confronted by another instructor.   Since that admission came on a Friday, that instructor told C.M. they would discuss it officially with the Academy's Director on Monday.   When the defendant learned of this, he told her they had to come up with a plan for Monday and deny the relationship.   He once again told her that if she admitted the affair, she would be kicked out of the Academy and that he would call every area police department and inform them not to hire her.   However, he also told her that he would help her enter a different academy and/or obtain employment at a Menocal family-owned business if she did what he instructed and protected him.

13

The defendant urged C.M. to resign and state that she wanted to leave the Academy because she was pregnant.  He dictated a resignation letter for her to submit and then ensured that she submitted the memo he had dictated.   On Monday, C.M. heard the defendant deny the relationship in a meeting with the Academy Director, and then during her meeting with the Director, she submitted the resignation memo and remained steadfast in her false denial despite her admission of the affair the previous Friday.   The defendant also persuaded C.M. not to speak to an HPD PCB detective looking into the defendant's behavior at the Academy.   C.M. initially agreed to meet the detective, but the defendant convinced her not to cooperate.   He also dictated a text that he directed her to send to the detective telling him she would not meet with him.   Thereafter, the defendant thanked her and offered to help her start at the City of Miami Academy or find her a job at his grandmother's security company, but she turned down these offers.[8]

Along with C.M.'s testimony, the government will offer the messages exchanged between C.M. and the defendant, and C.M. and other individuals that will corroborate her testimony. When C.M. met with the FBI and recounted the illicit affair, she gave consent for a search of her computer.   This search revealed these messages.   In addition, the government will offer evidence establishing the Academy's prohibition of sexual relationships between instructors and trainees, as well as documentation regarding the Academy's efforts to investigate their illicit relationship.

**The HPD Surveillance Videos from Substation 5**

As previously described, HPD Substation 5 was the location where the defendant committed the offenses charged in Count 1 of the Indictment (involving Victim 1) and Count 1 of the Superseding Information (involving Victim 3).   During May and June 2015, HPD had a multi-

---

[8] Even after she protected him with the Academy leadership, the defendant continued to pressure her about aborting the baby.   However, the pregnancy eventually ended when C.M. miscarried.

camera surveillance system recording views from various locations inside and outside of the substation, including both the front and rear parking lots.   Most of the inside camera views were of the various hallways in the substation, and did not offer views inside the substation's various rooms.   As part of its investigation of Victim 1's complaint against the defendant in June 2015, HPD retrieved and preserved a limited number of video recordings from May and June 2015, showing the defendant escorting young women into Substation 5.   Aside from Victim 1, HPD was unable to identify any of the ten other women portrayed.   HPD subsequently provided these recordings to the federal government in connection with the investigation that led to the charges in this case.

The government was able to identify one of the women as Victim 3, and the videotape from that incident will be part of the government's proof of Count 1 of the Superseding Information. The government intends to offer into evidence, pursuant to Rule 404(b), the remaining video evidence showing the defendant escorting the other nine still unidentified young women into Substation 5 on nine separate occasions during the period of May 9, 2015 through June 13, 2015.   All of these incidents occurred on the weekend or after 5:00 PM.   Some of the videos show the young women arriving at Substation 5 as passengers in the defendant's marked HPD vehicle. The defendant then brings those young women into Substation 5 through the back door.   One video shows a woman following the defendant's marked unit in her own car and going into the gated parking lot, where she is seen exiting the vehicle and entering Substation 5 accompanied by the defendant.   The remaining videos show young women arriving at the front door on their own while the defendant was already in Substation 5 and the defendant bringing them in through the locked front entrance.

The video evidence then shows the defendant bringing each of these women into closed

rooms in the substation that were not covered by the surveillance system.   Notably, the defendant did not document any of these encounters: neither HPD nor the government have been able to locate any police reports relating to these interactions, and the defendant's Daily Activity Reports contain no entries reflecting his having brought these young women into the substation, or reflecting any interactions with civilians during the times in question.   These HPD records, and the absence thereof, also will be offered in evidence in connection with these video recordings.[9]

**ADMISSIBILITY OF EVIDENCE UNDER RULE 413**

**Rule 413 and Evidence of Other Sexual Assaults**

Rule 413 of the Federal Rules of Evidence provides: "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault.   The evidence may be considered on any matter to which it is relevant."   Fed. R. Evid. 413(a).   Rule 413 defines "offenses of sexual assault" as, *inter alia*, "contact, without consent, between any part of the defendant's body … and another person's genitals or anus;" and "contact, without consent, between the defendant's genitals or anus and any part of another person's body."   Fed. R. Evid. 413(d)(2) and (d)(3).

In contrast to Rule 404(b) evidence, which is not admissible to prove the defendant's criminal propensity to commit the charged offense, it is well established that in sexual assault cases, the Eleventh Circuit has clearly held that Rule 413 permits the introduction of evidence of other sexual assaults as "propensity evidence" in sexual assault cases.   *United States v. Brimm*, 608 F. App'x. 795, 798 (11th Cir. 2015).   This is in line with the view of the other circuits that have addressed the issue, as well the clear language and Congressional intent behind Rule 413.

---

[9] These video recordings and HPD records have been provided in discovery.

16

*See also United States v. Hollow Horn*, 523 F.3d 882, 887 (8th Cir. 2008) (evidence showing that the defendant committed another sexual assault "'may be considered for its bearing on any matter to which it is relevant,' *including the defendant's propensity to commit such offenses*.") (internal citations omitted; emphasis added); *United States v. Hawpetoss*, 478 F.3d 820, 823 (7th Cir. 2007) (Rule 413 "create[s] an exception to the general prohibition against 'propensity evidence' found in Federal Rule of Evidence 404(b)"); *United States v. Batton*, 602 F.3d 1191, 1196 (10th Cir. 2010) (Rule 413 allowing use of evidence of prior sexual assaults to prove propensity "[is] 'based on the premise that evidence of other sexual assaults is highly relevant to prove propensity to commit like crimes.'") (internal citation omitted); *United States v. McGuire*, 627 F.3d 622, 627 (7th Cir. 2010); *United States v. Redlightning*, 624 F.3d 1090, 1119-20 (9th Cir. 2010).

**Threshold Requirements for Admission Pursuant to Rule 413**

Based on the language of the rule and the case law interpreting it, a court assessing the admissibility of proposed Rule 413 evidence must make three threshold determinations before reaching the Rule 403 balancing test.   First, that the defendant is accused of an offense of sexual assault.   Second, that the evidence proffered involves the defendant's commission of another sexual assault.   Third, that the evidence is relevant.[10]   All three of these conditions are satisfied here.

First, as explained above, the defendant is accused of sexual assault offenses.   Both Count 2 of the Indictment and Count 1 of the Superseding Information charge violations of 18 U.S.C. §242 that constitute sexual assaults.   Section 242 often is used to prosecute sexual assaults committed under color of law such as those charged in this case.   *See, e.g.*, *United States v. Shaw*,

---

[10] Evidence is deemed relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."   Fed. R. Evid. 401.

891 F.3d 441, 450-53 (3d Cir. 2018) (affirming conviction of former corrections officer for sexually assaulting a female inmate in violation of 18 U.S.C. §242); *United States v. Webb*, 214 F.3d 962, 963-64 (8th Cir. 2000) (affirming conviction of sheriff who sexually assaulted women requesting assistance in enforcing restraining orders); *United States v. Lanier*, 201 F.3d 842, 844 (6th Cir. 2000) ("Lanier was charged with violating §242, which prohibits a person acting under color of state law from violating the rights and privileges secured by the Constitution and laws of the United States, including the right to be free from willful sexual assault."); *Pilati v. United States*, 2016 WL 4083245, at \*\*1-4, 8 (N.D. Ala. Mar. 23, 2016) (recommending denial of a 28 U.S.C. § 2255 motion stemming from the conviction of a district attorney for violating 18 U.S.C. §242 by sexually abusing five victims under the guise of conducting court-ordered drug testing).[11]

More specifically, both of these charges fall squarely within Rule 413's definition of an offense of sexual assault as an offense that involves "contact, without consent, between the defendant's genitals or anus and any part of another person's body."  Count 2 of the Indictment alleges that the defendant forced Victim 2 to place her hand on his penis, and Count 1 of the Superseding Information charges that the defendant caused Victim 3 to perform oral sex on him, thereby putting her mouth on his penis.  Thus, both charges involve contact without consent between the defendant's genitals and any part of Victim 2 and Victim 3's bodies, and as a result, they are sexual assault offenses for purposes of Rule 413.

Second, as described above, the Rule 413 evidence the government seeks to offer concerning Victim 4 and Victim 5 relates to the defendant's commission of another sexual assault. The defendant used his police authority to force minor Victim 4 to perform oral sex on him, which

---

[11] This report and recommendation was adopted by the district court.  *Pilati v. United States*, 2016 WL 4070148 (N.D. Ala. July 29, 2016).

involved non-consensual contact between the defendant's genitals and Victim 4's mouth, and thus qualifies as sexual assault under Rule 413(d)(3).  He also used his police authority to pressure Victim 5 to perform oral sex on him and engage in sexual intercourse with him.  This conduct involved both non-consensual contact between the defendant's genitals and Victim 5's body, and non-consensual contact between the defendant's body and Victim 5's genitals, qualifying as sexual assault under both Rule 413(d)(2) and 413(d)(3).

Third, the proffered evidence is relevant as proof of the defendant's propensity to commit the charged offenses, as well as proof of his intent, motive, plan, identity, and *modus operandi*. Propensity to commit the charged crime is a basis of admissibility unique to Rule 413, and is the focus of this section, while the other bases will be addressed in the Rule 404(b) analysis below.

Here, the proffered Rule 413 evidence is virtually identical to the charged conduct.  The defendant used his police authority to compel Victim 4 to perform oral sex on him, and this is the same conduct charged in Count 1 of the Superseding Information relating to Victim 3.  It also is quite similar to the conduct charged in Count 2 of the Indictment, where the defendant relied on his police authority to force Victim 2 to either masturbate him or have sexual intercourse with him. In similar fashion, the defendant used his police authority to compel Victim 5 to perform oral sex on him and have sexual intercourse with him, the same type of conduct he is charged with here.

This evidence of virtually identical sexual assaults clearly shows the defendant's propensity to commit the charged crimes and establishes its relevance.  *Redlightning*, 624 F.3d at 1120 ("Evidence that tends to show that [a defendant] committed another sexual assault . . . was admissible under Rule 413 because it tends to show that [the defendant] had the propensity to commit another sexual assault . . ."); *United States v. Rogers*, 587 F.3d 816, 821 (7th Cir. 2009) (evidence of past sexual assaults suggests that the defendant "is more likely to have done the same

19

thing again.").   Moreover, this propensity evidence is particularly relevant here because it provides corroboration for the testimony of Victim 2 and Victim 3, whose credibility will undoubtedly be challenged, and where the offenses occurred outside the presence of other witnesses.   *See United States v. Enjady*, 134 F.3d 1427, 1432 (10th Cir. 1998).

### The Defendant's Other Sexual Assaults Satisfy the Rule 403 Balancing Test

The final step for determining whether evidence of other sexual assaults is admissible is application of the Rule 403 balancing test.   *Brimm*, 608 F. App'x. at 798 (collecting cases).   Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.   Here, as explained below, the evidence concerning the defendant's sexual assaults of Victim 4 and Victim 5 clearly is admissible since it is highly probative and in no way unfairly prejudicial.

The Eleventh Circuit has clearly stated that "Rule 403 is 'an extraordinary remedy which the district court should invoke sparingly, and the balance . . . should be struck in favor of admissibility.'"   *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003) (internal citations omitted).   In addition, in the Rule 413/414 setting, "there is 'strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible.'"   *United States v. Medicine Horn*, 447 F.3d 620, 623 (8th Cir. 2006) (quoting *United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997)).[12]   *See also United States v. Larson,* 112 F.3d 600, 605 (2d Cir. 1997) (explaining

---

[12] Because the language of Rules 413 and 414 are so similar, and because they serve the identical function of permitting the use of propensity evidence in sexual abuse cases, courts commonly rely on cases interpreting one rule to interpret the other.   *See*, *e.g.*, *United States v. Sioux*, 362 F.3d 1241, 1244 n. 4 (9th Cir. 2004) ("Due to the striking similarities between these rules and the fact that they are *in pari material*, we have followed decisions interpreting each of these rules individually in cases interpreting their companions.").

that "[w]ith respect to the Rule 403 balancing, however, the sponsors stated that '[t]he presumption is that the evidence admissible pursuant to these rules [413 and 414] is typically relevant and probative and that its probative value is not outweighed by any risk of prejudice.'") (internal citations omitted).

Here, as previously explained, the proffered testimony of Victim 4 and Victim 5 is highly probative of the defendant's propensity to commit the charged offenses, and is not outweighed by a danger of unfair prejudice to the defendant.   The proffered evidence involves conduct that is nearly identical to the charged conduct and that was ongoing at essentially the same time that the defendant committed the charged offenses.   This substantive and temporal similarity weighs heavily in favor of admissibility because it minimizes any risk of unfair prejudice, particularly since courts have regularly admitted evidence under Rules 413 and 414 of similar acts of sexual assault and/or child molestation that occurred many years prior to the charged conduct.   *See, e.g.*, *United States v. O'Connor*, 650 F.3d 839, 853 (2d Cir. 2011) (holding no abuse of discretion because similarity of Rule 413 evidence and charged conduct made probative value of evidence greater than risk of unfair prejudice); *McGuire*, 627 F.3d at 627 (affirming admission of prior acts of sexual abuse, noting "striking similarities" between prior acts and uncharged conduct and fact that prior acts evidence was material to addressing the "brutal cross-examination" of victim of charged conduct); *Batton*, 602 F.3d at 1194, 1196-97 (affirming admission of Rule 413 evidence under Rule 403 where "prior sexual assault against a fourteen-year-old boy was strikingly similar to the charged offense and helped the jury determine the validity of the victim's accusations").

Moreover, the fact that the proffered evidence clearly supports the premise that during late 2014 and into 2015 (until Victim 1 reported the matter to HPD on the evening of June 13, 2015), the defendant was regularly abusing his HPD police position and authority to obtain sexual

21

gratification from young women in Hialeah is what makes it highly relevant.   This pattern of conduct is powerful proof of his propensity to violate the civil rights of young women by sexually assaulting them under color of law, and it provides valuable corroboration for the testimony of Victims 2 and 3, who certainly will be subject to searching cross-examination.   Thus, while this evidence may be prejudicial to the defense, it is not "unfairly" prejudicial, and therefore, it should not be excluded under Rule 403.[13]

Moreover, evidence relating to Victims 4 and 5 that establishes the defendant's criminal propensity is exactly the type of evidence that Rule 413 was designed to allow.   The law is clear that although Rule 403 still applies, evidence offered under Rule 413 "cannot be excluded under Rule 403 simply because it tends to show that the defendant has a propensity to commit a sex offense" as it would be under Rule 404(b).   *United States v. Loughry*, 660 F.3d 965, 970 (7th Cir. 2011).   In addition, any possible risk of undue prejudice can be reduced by a limiting instruction given when the evidence is introduced and then again when the jury is instructed prior to its deliberations.   *Brimm*, 608 F. App'x at 800-801.

Finally, as described above, this evidence relating to the defendant's sexual assault of Victims 4 and 5 will be limited in scope.   It will consist primarily of the testimony of these victims and certain supporting evidence.   Because this evidence will be focused and limited in scope, it presents no danger of delay, confusion, wasting judicial and jury time, or the needless presentation of cumulative evidence.   As a result, these Rule 403 factors also weigh in favor of admission of

---

[13] It is sensible to assume that all evidence offered by the government will be prejudicial to the defendant since it is being offered to prove the defendant's guilt.   Rule 403's charge is the much narrower subset of unfairly prejudicial evidence where any scant probative value is outweighed by great risks of unfair appeals to the jury's emotions or prejudices.   Thus, "[Rule 403] 'is meant to … permit the trial judge to preserve the fairness of the proceedings,' but not to 'permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.'"   *United States v. Syed*, 616 F. App'x 973, 980 (11th Cir. 2015) (quoting *United States v. Meester*, 762 F.2d 867, 875 (11th Cir. 1985).

this highly probative evidence, and its use should be allowed pursuant to, and for the purposes stated in, Rule 413.

### ADMISSIBILITY OF EVIDENCE UNDER RULE 404(b)

**Rule 404(b) and Evidence of Other Sexual Assaults, the Consensual Sexual Relationship, and the Substation 5 Videotapes**

Rule 404(b) of the Federal Rules of Evidence provides: "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character . . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   Rule 404(b).   "Rule 404(b) is a rule of inclusion which allows prior bad acts evidence unless it tends to prove only criminal propensity." *United States v. Gates*, 351 F. App'x 362, 367 (11th Cir. 2009); *United States v. Rojas*, 145 F. App'x 647, 649 (11th Cir. 2005) ("[Rule 404(b)] 'is rule of inclusion, and … accordingly 404(b) evidence, like other relevant evidence, should not be excluded when it is central to the prosecution's case.'" (quoting *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003)).

The Eleventh Circuit applies a three-part test to determine whether extrinsic evidence of prior bad acts is admissible under Rule 404(b):   "First, the evidence must be relevant to an issue other than the defendant's character.   Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act.   Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403."[14]   *United States v. Jernigan*,

---

[14] Federal Rule of Evidence 403 provides, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

341 F.3d 1273, 1280 (11th Cir. 2003).

Regarding the first prong, relevant extrinsic acts evidence is permitted on a number of issues separate and apart from the defendant's character, including intent, knowledge, motive, identity, and *modus operandi*.   Similarity of the extrinsic acts to the offenses with which the defendant is charged is the standard by which relevance is measured under Rule 404(b).   *Rojas*, 145 F. App'x at 649; *United States v. Williams,* 816 F.2d 1527, 1531 (11th Cir. 1987) (same). Moreover, the extrinsic acts themselves need not be criminal.   *United States v. Kapordelis,* 569 F.3d 1291, 1313 (11th Cir. 2009).

Regarding the second prong, there must only be "sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question."   *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).   *See also Kapordelis,* 569 F.3d at 1313-14 1291 (affirming admission of victim's testimony about defendant's prior sexual abuse pursuant to Rules 404(b) and 403); *United States v. Lampley*, 68 F.3d 1296, 1299 (11th Cir. 1995) (uncorroborated testimony of one witness sufficiently credible, even when the witness's accounts revealed certain inconsistencies).

Regarding the third prong, "the probative value of the evidence must not be *substantially outweighed* by unfair prejudice" and this "determination lies within the sound discretion of the district judge and calls for a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness."   *Rojas*, 145 F. App'x at 649-50 (quoting *Jernigan,* 341 F.3d at 1282; emphasis in original).   *See also United States v. Chase*, 367 F. App'x 979, 981 (11th Cir. 2010) ("With regard to the third prong, 'whether the probative value of Rule 404(b) evidence outweighs its prejudicial effect depends upon the circumstances of the extrinsic

offense.'" (quoting *Edouard,* 485 F.3d at 1345).   In addition, "the risk of undue prejudice can be reduced by an appropriate limiting instruction."   *Id*.

In making this determination, it must be remembered that the Eleventh Circuit has recognized that Rule 403 is "an extraordinary remedy to be used sparingly."   *Syed*, 616 F. App'x at 980.   When the Court is weighing the evidence in light of Rule 403, "the balance 'should be struck in favor of admissibility.'"   *Edouard,* 485 F.3d at 1344 n.8 (quoting *United States v. Smith,* 459 F.3d 1276, 1295 (11th Cir. 2006).   Finally, Rule 403 is meant to permit the "trial judge to preserve the fairness of the proceedings," but not to "permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none."   *Syed,* 616 F. App'x at 980.

### The Rule 404(b) Evidence is Relevant

The evidence of the defendant's use of his police position and authority to sexually assault Victim 4 and Victim 5, conduct that is virtually identical to the charged conduct, is admissible to prove the defendant's intent, knowledge, motive, plan, absence of mistake or accident, opportunity, and identity and *modus operandi*.[15]   The evidence of the defendant's improper sexual relationship with Academy trainee C.M. is admissible for the same set of reasons.   Even though that sexual relationship between the defendant and C.M. was consensual and thus not covered under Rule 413, it still involved the defendant using his position of police authority and power to obtain sexual gratification from C.M., who was hoping to become an HPD officer upon graduation.[16]

---

[15] While the government believes that evidence of the defendant's sexual assaults of Victim 4 and Victim 5 also is admissible under Rule 404(b), it is the government's position that this same evidence is primarily admissible under Rule 413, which allows its use to prove the defendant's propensity to commit sexual assaults such as the charged conduct as well as for other reasons.

[16] The defendant offered to assist C.M. in obtaining a position with HPD, and when their relationship was discovered, he then offered her a job or help getting into a different police academy to get her to lie and cover up his involvement.

The similarity of this conduct to the charged conduct, including the virtually identical nature of his sexual assaults of Victim 4 and Victim 5, makes it not only strong evidence of the defendant's *modus operandi* and identity, plan, knowledge, and lack of mistake, but also makes it crucial evidence of the defendant's intent, an element that the defendant has put in issue by pleading not guilty.   *United States v. Hardy*, 520 F. App'x 835, 840 (11th Cir. 2013) ("examining the first prong of the Rule 404(b) analysis, [the defendant] rendered his intent a material issue by pleading not guilty.").   The Eleventh Circuit has regularly approved the use of similar extrinsic acts evidence to prove a defendant's intent.   *See United States v. Hewes*, 729 F.2d 1302, 1314 (11th Cir. 1984) (extrinsic act evidence can be "highly probative on the issue of intent"); *United States v. Calderon*, 127 F.3d 1314, 1331 (11th Cir. 1997) (prior convictions properly used under Rule 404(b) to prove intent).

Here, the sexual assaults on Victim 4 and Victim 5 and the incident with C.M. all involve the defendant willfully misusing his police position and authority to secure sexual gratification from those under his control and authority (Victim 4 and Victim 5) or beholden to him (C.M.). That is the same intent the government must prove to establish the charged conduct involving Victim 1, Victim 2, and Victim 3, and as a result, this evidence is highly relevant and should be admissible.[17]   *See United States v. Barrington*, 648 F.3d 1178, 1186 (11th Cir. 2011) ("[w]here extrinsic act evidence is offered to prove intent, its relevance is determined by comparing the defendant's state of mind in perpetrating both the extrinsic and charged offenses") (internal quotation omitted).

As regards the Substation 5 video recordings, because the defendant's failure to document

---

[17] To prove that the defendant violated Section 242, the government must show that the defendant acted willfully in depriving the victims of their constitutional rights.   *United States v. House*, 684 F.3d 1173, 1198 (11th Cir. 2012).

those encounters has made it extremely difficult to identify the other young women he was bringing into Substation 5 during May and June 2015, this evidence is not being offered to show the defendant's intent since his actions with them are not known.   Regardless, this evidence is relevant to show the defendant's *modus operandi*, opportunity, identity, knowledge, plan, and lack of mistake or accident.   The video recordings show him using his police position and authority to bring young women into Substation 5 after hours and on weekends.   In addition, he brings some of these young women to the substation in his HPD vehicle, reflecting that they likely were arrested or detained by the defendant.   He takes all of them into closed areas out of view of the surveillance cameras before they eventually return to view a few minutes later, exactly what occurred with Victim 1 and Victim 3.

As with Victim 1, despite HPD's requirements, the defendant did not inform the HPD dispatcher that he was transporting these young women, nor did he have a female officer, or any other officer, with him during these incidents.   In addition, there is no HPD paperwork reflecting any of these encounters, and they are not reflected in the defendant's Daily Activity Reports ("DAR") for these days, even though he lists other activity on those DARs.   Simply put, these video recordings are significant evidence showing the method the defendant used to violate the civil rights of Victim 1, Victim 2, and Victim 3 to obtain his own sexual gratification, and as such, are highly relevant and admissible under Rule 404(b).

### The Rule 404(b) Evidence is Established by Sufficient Proof

All of the proposed Rule 404(b) evidence is supported by sufficient proof under the standards set by the Eleventh Circuit.   Victim 4 will testify about her sexual assault at the hands of the defendant, an assault that was similar to and occurred around the time of his assaults on

Victim 2 and Victim 5.   In addition, the defendant's sexual assault of Victim 4 was similar in general nature to his assaults on Victims 1 and 3.   Victim 5 also will testify about how the defendant sexually assaulted her.   This testimony will be corroborated by the audio recording she made while the assault was taking place.   Victim testimony of this type is more than sufficient to meet the standard for admissibility under Rule 404(b).

Regarding the defendant's sexual relationship with C.M., as previously explained, the government will offer C.M.'s testimony supported by substantial evidence corroborating both the sexual relationship and the defendant's successful efforts to pressure her to lie about the relationship and cover up his improper conduct.   This large volume of evidence far exceeds the low bar for sufficiency set by Rule 404(b).   Finally, as to the Substation 5 video recordings, there can be no serious challenge to the fact that the defendant brought these unidentified young women into Substation 5 and took them into closed rooms out of view of the surveillance cameras.   The videos speak for themselves and other evidence including Substation 5 access records supports them.

### The Probative Value of the Rule 404(b) Evidence is Not Substantially Outweighed by Undue Prejudice

The Eleventh Circuit has held that evaluating the probative value of extrinsic acts "calls for a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Calderon*, 127 F.3d at 1332.  *See also Jernigan*, 341 F.3d at 1282; *Chase*, 367 F. App'x at 981; *Rojas,* 145 F. App'x at 649-50 (emphasis in original).

### Need

The government needs the proposed 404(b) evidence because none of the actual sexual abuse committed by the defendant on the victims was witnessed by a third party or captured on

Substation 5's surveillance cameras.   The surveillance cameras captured the lead-up to his abuse of Victim 1 and Victim 3, but he brought his victims out of camera view to commit the actual abuse.   In addition, each of these three victims certainly will be subject to thorough and searching cross-examination.   The Rule 404(b) evidence will provide significant evidence relating to key aspects of their accounts by showing the defendant using the same method of abusing his police position and engaging in similar conduct with other young women during the same basic timeframe.

### Similarity

The similarity of the proposed 404(b) evidence to the charged conduct in this case weighs strongly in favor of admissibility in this case.   The evidence relating to the defendant's sexual assaults of Victim 4 and Victim 5 is virtually identical to the charged conduct, particularly Counts 2 and 3, which involved the defendant sexually assaulting Victim 2 and Victim 3.   In addition, because the evidence of the charged conduct involves the defendant committing sexual assaults, this evidence of two additional sexual assaults does not create the risk of inflaming the jury by bringing in extrinsic act evidence of sexual assault where the jury would otherwise not see evidence of the defendant committing sexual assaults on young women.

The conduct shown in the video recording evidence of the defendant bringing the as yet unidentified young women into Substation 5 after hours and on weekends and taking them to closed rooms out of the view of the surveillance cameras also bears a striking resemblance to how the defendant committed his crimes against Victim 1 and Victim 3.   Like with Victim 1, he documented none of the encounters that he had with these young women in an HPD substation that was not open to the public, even though the video recordings show he brought a number of

them to substation in his HPD marked unit.[18]   In addition, as with Victim 1 and Victim 3, he takes these young women to closed rooms out of view of the surveillance cameras, before re-emerging a short time later.

The evidence relating to the defendant's sexual relationship with C.M. is similar to the charged conduct in that the defendant used his position of authority over C.M. as an instructor promising to assist her obtain a position with HPD to obtain sexual gratification from her.   When the relationship was discovered, the defendant then pressured C.M. to falsely deny it and remain quiet by threatening to ruin her career if she did not, and offering to help her if she did.   This is a similar *modus operandi* to how he pressured his sexual assault victims to remain silent or face consequences.

**Temporal Remoteness**

This factor weighs heavily in favor of admission of the Rule 404(b) evidence.   The defendant's sexual assaults of Victim 4 and Victim 5 occurred in late 2014 or very early 2015, right around the same time he sexually assaulted Victim 2.   The Substation 5 videos are all from May and June 2015, which is the same time he violated the civil rights of Victim 1 and Victim 3. The evidence relating to C.M. is from mid-2017, while the defendant was aware that he was still under investigation by HPD for his actions relating to Victim 1, Victim 2, and Victim 4.   This two-year gap is well within the timeframe approved by the Eleventh Circuit.   *See Syed*, 616 F. App'x at 980-81 (the court looked to similarity of facts between the prior act and the instant offense, even though the communications with were over 10 years old); *United States v. Pollock*,

---

[18] The defendant's failure to document these police encounters has hindered the ability to identify the young women, adding to the probative value of the evidence, since legitimate police encounters certainly would have been documented.   Despite the defendant's efforts to hide this activity by leaving no record trail, the government's efforts to identify these young women are continuing.   If any are identified, the government will file supplemental Rule 413/Rule 404(b) notices reflecting the new information learned.

926 F.2d 1044, 1047–48 (11th Cir. 1991) (holding that a five-year gap was not an abuse of discretion); *Lampley*, 68 F.3d at 1300 (providing that a 15–year time-span did not render the extrinsic acts too remote for proper consideration, despite the fact that the acts involving drugs differed in nature).

### Limiting Instructions to Mitigate Any Prejudice

Even if the Court concluded that there was some possible risk of undue prejudice arising from the proposed Rule 404(b) evidence, that risk can risk be reduced by an appropriate limiting instruction.   Indeed, the Eleventh Circuit has made it clear that limiting instructions can be used to mitigate any possible unfair prejudice.   *See Brimm,* 608 F.App'x at 800-801; *Jernigan*, 341 F.3d at 1282 (in case where district court gave the jury two separate limiting instructions regarding the impermissibility of considering defendant's previous convictions as propensity evidence, any "unfair prejudice that may have existed was mitigated by the district judge's limiting instruction.").

### CONCLUSION

As described herein, and in compliance with this Court's Orders (DE: 23, 35), the government has hereby provided the required notice of the Rule 404(b) evidence of which it currently is aware that it may seek to use at trial.   The government also has provided notice of the Rule 413 evidence of which it is currently aware.   This government may use this evidence in its

case-in-chief, during cross-examination of defense witnesses, and/or in its rebuttal case.   In

addition, if the government becomes aware of additional Rule 413 or Rule 404(b) evidence, it will

promptly provide a supplemental notice to the Court and the defendant.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

*s/ Edward N. Stamm*
EDWARD N. STAMM
FL Bar No. 373826
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, FL 33132
Tel: (305) 961-9164
edward.stamm@usdoj.gov

*s/ Ilham Hosseini*
ILHAM HOSSEINI
Court ID No. A5501904
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, FL 33132
Tel: (305) 961-9297
ilham.hosseini@usdoj.gov

ERIC S. DREIBAND
ASSISTANT ATTORNEY GENERAL

*s/ Samantha Trepel*
SAMANTHA TREPEL
Court ID No. A5501689
Special Litigation Counsel
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC   20530
Tel: (202) 305-3204
samantha.trepel@usdoj.gov