UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-20822-CR-WILLIAMS/TORRES(s)

UNITED STATES OF AMERICA

v.

JESUS MANUEL MENOCAL, JR.
_____ /

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO
GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EVIDENCE
<u>PURSUANT TO FEDERAL RULES OF EVIDENCE 404(b) AND 413</u>**

The United States hereby responds to the Defendant's Objections to Government's Notice

of Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 404(b) and 413

("Objections"), DE 76.   As detailed below, the evidence contained in Government's Notice of

Intent to Introduce Evidence Pursuant to Federal Rules of Evidence 413 and 404(b), DE 37,

("Notice") and the Government's Supplemental Notice of Intent to Introduce Evidence Pursuant

to Federal Rule of Evidence 404(b), DE 57, ("Supplemental Notice") is admissible.   Moreover,

the evidentiary hearing requested by the defendant is neither required by law nor necessary under

the facts and circumstances of this case.   Furthermore, the government hereby readopts and

reincorporates its Notice and Supplemental Notice as well as its Response to the defendant's prior

motion to exclude Rule 404(b) evidence, DE 49, in full as part of this response.

## I.        PROCEDURAL BACKGROUND

On August 10, 2020, the government filed its Notice setting out the evidence it was seeking

to offer under Rule 413 and/or Rule 404(b).   DE 37.   The proffered evidence was described in

detail in the Notice, and that detail is not repeated in this response.    In summary, the evidence the

government seeks to introduce pursuant to Rule 413 is evidence establishing the defendant's other

acts of sexual assault against Victim 4 and Victim 5.   The evidence the government seeks to

introduce pursuant to Rule 404(b), that was known to the government at the time of that initial Notice, concerns the 1) defendant's sexual relationship with C.M., a student trainee at the police academy where the defendant was an instructor; 2) his actions in May and June of 2015 in bringing a number of young women, after hours and on weekends, into a HPD substation (captured on surveillance video) that was not staffed or open to the public; and 3) evidence concerning Victim 4 and Victim 5, which is also admissible in the alternative under Rule 404(b).

On September 14, 2020, the defendant, through his prior counsel, filed his Opposition, DE 40.   The defendant conceded the substantive admissibility, pursuant to Rule 413, of the evidence of the defendant's other acts of sexual assault of Victim 4 and Victim 5.   However, he objected to the proposed Rule 404(b) evidence, claiming that it is not relevant for any proper purpose under Rule 404(b) and further arguing that even if relevant, the proffered evidence is unduly prejudicial under the Rule 403.   He also requested an evidentiary hearing.

On October 9, 2020, the government filed its Response to the defendant's Opposition, DE 49, ("Response"), setting forth the specific bases for the admission of the proposed Rule 404(b) evidence and citing cases from various courts of appeals affirming the admission of Rule 404(b) evidence in § 242 cases.   More specifically, the Response detailed that the Rule 404(b) evidence was relevant to show 1) willfulness and *modus operandi* for C.M.'s testimony; and 2) plan, opportunity, and *modus operandi* for the Substation 5 videos, as well as to rebut likely defenses. The Response also cited Supreme Court precedent holding that an evidentiary hearing is not required.

On March 29, 2021, the government filed its Supplemental Notice, DE 57, seeking to introduce newly discovered evidence pursuant to Rule 404(b) regarding 1) the defendant's conduct in connection with his May 2013 traffic stop of A.G.; and 2) the defendant's conduct in connection

with his Spring 2015 encounter with D.R.   Prior counsel did not respond to the Supplemental Notice.   On July 16, 2021, prior counsel was substituted for by Ms. Ratzan and Mr. Faccidomo as counsel of record for the defendant.   DE 65.   At the status conference on August 19, 2021, the Court granted new defense counsel additional time to review and respond to the proposed Rule 413 and 404(b) evidence.

In his recent Objections filed on October 7, 2021, DE 76, the defendant ignores the § 242 caselaw, the government's arguments laying out the specific bases for the admission of the proposed Rule 404(b) evidence, and the binding legal authority regarding the evidentiary hearing, which are discussed in the government's Response.   The defendant does not mention, cite to, or distinguish any of the § 242 cases affirming the admission of extrinsic evidence under Rule 404(b). Similarly, he does not discuss the government's specific Rule 404(b) legal arguments.   Notably, the defendant explains how the Rule 404(b) evidence is not relevant to motive, knowledge, or absence of mistake, DE 76 at 6, even though the government has not asserted any of those as the basis for the proposed Rule 404(b) evidence in its Response.   Instead of addressing the arguments and caselaw in the Response, the defendant simply makes general arguments regarding deficient notice, prejudice, delay, confusion, and remoteness.   Furthermore, the defendant for the first time objects to both the Rule 413 evidence and the additional 404(b) evidence in the Supplemental Notice.   The defendant also adopts and renews his request for an evidentiary hearing, DE 76 at 2, 34, despite the controlling caselaw to the contrary.

## II.  LAW AND ARGUMENT

### A.  RULE 413

The Rule 413 evidence concerning Victim 4 and Victim 5 was summarized in the government's original Notice, DE 37 at 7-11, and more detailed information about that evidence

and those two victims has been provided to the defendant in discovery throughout these proceedings.   The detailed summary in the original Notice is not repeated here, but is readopted in full.

### 1. Admissibility of Rule 413 Evidence

As a starting point, the parties agree that in determining the admissibility of the proffered Rule 413 evidence, the Court must make three threshold determinations before reaching the Rule 403 balancing test.   DE 76 at 22-23.   These determinations are: first, that the defendant is accused of an offense of sexual assault; second, that the evidence proffered involves the defendant's commission of another sexual assault; and third, that the evidence is relevant.   In addition, the parties also agree, DE 76 at 27, that unlike Rule 404(b), Rule 413 permits the introduction and use of evidence of other sexual assaults as "propensity evidence" in sexual assault cases.   *See, e.g.*, *United States v. Brimm*, 608 F. App'x 795, 798 (11th Cir. 2015).   If all three of these thresholds are cleared, then the Court applies the Rule 403 balancing test.

In addition, the parties agree on the application of the first threshold, that the defendant is accused of sexual assault.   The defendant concedes that Count 2 of the Indictment (Victim 2) and Count 1 of the Superseding Information (Victim 3) charge the defendant with sexual assault offenses within the scope of Rule 413, but asserts that Count 1 of the Indictment (Victim 1) does not, thereby preventing the government from using evidence admitted under Rule 413 to prove that specific count.   DE 76 at 23-26.   This coincides with the Government's position in its original Notice, that "[b]oth Count 2 of the Indictment and Count 1 of the Superseding Information charge violations of 18 U.S.C. § 242 that constitute sexual assaults."   DE 37 at 17.   However, the parties disagree on whether the second and third thresholds have been cleared.

**2. The Evidence Relating to Victim 4 Meets the Rule 413 Standard for Admission**

In essence, the Rule 413 evidence relating to Victim 4 is that one night in late 2014 or early 2015, when Victim 4 was 14 years old, the defendant, who Victim 4 knew as a sergeant from prior police encounters with him, forced her to enter his marked police vehicle, took her to a dark secluded location, pulled down his pants, and threatened to arrest her if she did not perform oral sex on him.   She complied with his demand, and then ran away after he ejaculated onto her shirt, initially telling no one about the incident out of fear and shame.   DE 37 at 7-9.

While the defendant concedes that this evidence satisfies the second threshold of alleging another sexual assault, he claims that it fails to satisfy the third Rule 413 threshold because "this incident does not have any relevance to proving the actual charges."   DE 76 at 27.   This argument appears to completely ignore the fact that Rule 413 specifically was designed to allow the admission of this type of evidence to prove the defendant's propensity to commit other sexual assaults.   Here, the evidence of how the defendant used his police position and authority to force Victim 4 to perform oral sex on him is virtually identical to the charged conduct relating to Victim 3 and very similar to the charged conduct relating to Victim 2.   In addition, the defendant's sexual assault of Victim 4 took place in late 2014 or early 2015, in the same time frame as the charged conduct relating to Victim 2 and Victim 3.

All of these factors establish that the evidence relating to Victim 4 is unquestionably highly relevant because it shows the defendant's propensity to commit the crimes against Victim 2 and Victim 3 that are charged in Count 2 of the Indictment and Count 1 of the Superseding Information. *See Brimm*, 608 F. App'x at 798; *United States v. Redlightning*, 624 F.3d 1090, 1120 (9th Cir. 2010) ("Evidence that tends to show that [a defendant] committed another sexual assault . . . was admissible under Rule 413 because it tends to show that [the defendant] had the propensity to

commit another sexual assault . . . ."); *United States v. Rogers*, 587 F.3d 816, 821 (7th Cir. 2009) (evidence of past sexual assaults suggests that the defendant "is more likely to have done the same thing again."); DE 37 at 16-17 (citing additional cases).   Moreover, this evidence also is particularly relevant here because it provides valuable corroboration for the testimony of Victim 2 and Victim 3, whose credibility will undoubtedly be challenged, and who were assaulted in isolated areas and/or outside the presence of other witnesses.  *See United States v. Guidry*, 456 F.3d 493, 502-04 (5th Cir. 2006) (affirming admission of uncharged sexual assault committed by defendant police officer in § 242 sexual assault case pursuant to Rule 413 and explaining that "[b]ecause sexual assault allegations are often reduced to a swearing match," Rule 413 evidence may "assist the fact finder's assessment of credibility"); *United States v. Enjady*, 134 F.3d 1427, 1432 (10th Cir. 1998) (Rule 413 "'permits other victims to corroborate the complainant's account via testimony about the defendant's prior sexually assaultive behavior'").

Because the evidence relating to the defendant's sexual assault of Victim 4 satisfies the three threshold requirements of Rule 413, the last step in determining admissibility is the Court's application of the Rule 403 balancing test to determine whether the probative value of the evidence "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   Here, where the evidence relating to Victim 4 is highly probative, not unfairly prejudicial, limited in scope, and raises no risk of confusing the issues or misleading the jury, it raises no Rule 403 concerns and should be admissible.

In addressing the balancing test, the defendant fails to acknowledge that the Eleventh Circuit has clearly stated that "Rule 403 is 'an extraordinary remedy which the district court should invoke sparingly, and the balance . . . should be struck in favor of admissibility.'"   *United States*

*v. Dodds*, 347 F.3d 893, 897, 899 (11th Cir. 2003) (internal citations omitted) (affirming admission of 66 images of child pornography, which the defendant claimed was unfairly cumulative, prejudicial, and had minimal probative effect under Rule 403).   In addition, in the setting of Rules 413 and 414, "there is 'strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible.'"   *United States v. Medicine Horn*, 447 F.3d 620, 623 (8th Cir. 2006) (quoting *United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997));[1] *see also United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) (explaining that "[w]ith respect to the Rule 403 balancing, however, the sponsors stated that '[t]he presumption is that the evidence admissible pursuant to these rules [413 and 414] is typically relevant and probative, and that its probative value is not outweighed by any risk of prejudice.'") (internal citations omitted) (second alteration in original); *United States v. Loughry*, 660 F.3d 965, 970 (7th Cir. 2011) (evidence offered under Rule 414 (and thus, by extension, Rule 413) "cannot be excluded under Rule 403 simply because it tends to show that the defendant has a propensity to commit a sex offense" as it would be under Rule 404(b)).

The defendant also ignores the significance of the fact that the evidence relating to Victim 4 describes a sexual assault that is very similar to the sexual assaults charged in Count 2 of the Indictment and Count 1 of the Superseding Information.   The law is clear that this close factual similarity makes its probative value far greater than any risk of unfair prejudice, thereby allowing its admission under Rule 413.   *See, e.g.*, *United States v. O'Connor*, 650 F.3d 839, 853-54 (2d Cir. 2011) (holding no abuse of discretion because similarity of Rule 413 evidence and charged

---

[1] Because the language of Rules 413 and 414 is so similar, and because the two rules serve the identical function of permitting the use of propensity evidence in sexual abuse cases, courts commonly rely on cases interpreting one rule to interpret the other.   *See, e.g.*, *United States v. Sioux*, 362 F.3d 1241, 1244 n.4 (9th Cir. 2004).

conduct made probative value of evidence greater than risk of unfair prejudice); *United States v. McGuire*, 627 F.3d 622, 627 (7th Cir. 2010) (affirming admission of prior acts of sexual abuse, noting "striking similarities" between prior acts and uncharged conduct and fact that prior acts evidence was material to addressing the "brutal cross-examination" of victim of charged conduct); *United States v. Batton*, 602 F.3d 1191, 1194, 1196-97 (10th Cir. 2010) (affirming admission of Rule 413 evidence under Rule 403 where "prior sexual assault against a fourteen-year-old boy was strikingly similar to the charged offense and helped the jury determine the validity of the victim's accusations").

Instead of challenging the probative value of this highly relevant evidence head-on, the defendant raises a variety of other challenges, none of which are well-founded.  First, the defendant claims that significant prejudice arises from the fact that the encounter with Victim 4 took place over six years ago and the government has not specified an exact date for the offense, asserting that he therefore no longer has the ability to defend himself against it.   Without citation to any legal authority, he appears to claim that Rule 413 evidence must be linked to a specific recent date and time to be admissible.   However, the law does not require this, and it would be unrealistic to assume and unfair to require that sexual assault victims either report the assault immediately or somehow otherwise document the date and time they were victimized for their evidence later to be admissible.   That is particularly the case where a 14-year-old girl living in Hialeah was sexually assaulted by a Hialeah Police Officer.

In addition, the defendant fails to address the fact that the sexual assault of Victim 4 took place within the same time frame as the charged conduct involving Victim 2 and Victim 3.   This temporal similarity between the evidence relating to Victim 4 and the charged conduct weighs heavily in favor of admissibility, particularly since the Eleventh Circuit and other courts have

regularly admitted evidence under Rules 413 and 414 of similar acts of sexual assault and/or child molestation even when they occurred many years prior to the charged conduct. *See United States v. Syed*, 616 F. App'x 973, 980, 980-81 (11th Cir. 2015) (the court looked to similarity of facts between the prior act and the instant offense, even though the communications were over 10 years old); *United States v. Pollock*, 926 F.2d 1044, 1047-48 (11th Cir. 1991) (holding that a five-year gap was not an abuse of discretion); *Lampley*, 68 F.3d at 1300 (providing that a 15-year time-span did not render the extrinsic acts too remote for proper consideration, despite the fact that the acts involving drugs differed in nature).

Continuing in his effort to conjure up unfair prejudice where none exists, the defendant next makes an implausible argument based on the portion of Victim 4's account where she described throwing her t-shirt into a lake after the defendant ejaculated onto it. The defendant seems to be accusing the government of hiding or ignoring evidence so that it can somehow tell the jury that there was inculpatory DNA evidence that we could not find: "the government intimates that there is potentially inculpatory DNA evidence, but conveniently that evidence was never found or produced" and "the Defendant is placed in the impossible position of defending against potential DNA evidence that conveniently could not be located . . . ." DE 76 at 28.

Setting aside the highly offensive nature of this patently false accusation, this argument is senseless. The defendant is well aware from the discovery provided by the government that HPD investigators deployed a team of divers from the Miami Police Department to search a portion of the lake—months after Victim 4 was assaulted—but was unsuccessful in the effort to find this t-shirt. The assertion that the government would deliberately choose to not find inculpatory evidence, or if it found it, would choose to not test or produce it to the defense and thus not use it at trial, is absurd. In addition, the defendant fails to explain how it is that the government is going

to then make this argument to the jury to convince them to convict the defendant based on potential DNA evidence that was never found, and thus never presented at trial.

The defendant also claims that Victim 4's account is unreliable and should be excluded because he believes the identification procedures used were subject to challenge.  This claim provides no basis for the exclusion of this evidence.   The defendant's focus on the identification procedures used is essentially a red herring based on a faulty factual premise, since it ignores the fact that Victim 4 has consistently stated that she knew the defendant from police encounters prior to being sexually assaulted by him.   Victim 4 lived in Hialeah, and as she explained, the defendant had on multiple occasions warned or cited her and her friend for trespassing and loitering at local Hialeah businesses including a McDonald's she would frequent.   Contrary to the defendant's claim that Victim 4's evidence "is based on her tainted identification of the single photograph of her alleged assailant from years prior," DE 76 at 29, the reality is that Victim 4's evidence is based on her personal knowledge of the defendant.   Victim 4 was not sexually assaulted by a stranger who she identified as the defendant due to a suggestive identification procedure.   Rather, she was sexually assaulted by a police officer she knew as "the Sergeant" because he had interacted with her and her friends on multiple occasions prior to the assault.

The defendant's final challenge to the admissibility of this evidence is his claim that its admission will cause undue delay.   Specifically, he claims that "defense counsel would be ineffective if they did not spend significant time exposing the issues in reliability and flaws in the evidence through cross examination" that would lead to "a multi-day delay wherein the jury will become focused on a salacious, unsubstantiated, accusation . . . ."   DE 76 at 30.   Since the charges in this case already focus on the defendant's abuse of his police position and authority to obtain sexual gratification from young women, Victim 4's account will in no way inflame the jury since

it describes conduct very similar to the charged conduct they will be considering.

Even more importantly, the fact that the defendant now claims he will need a number of days to challenge Victim 4 undercuts his earlier claim that the evidence should be excluded because he has no ability to even try to defend himself.   DE 76 at 28.   His claim that this cross-examination will take multiple days shows that he believes he has ample evidence to challenge Victim 4 and her account of the incident, even if it strains credulity to believe that this cross-examination actually will cause a "multi-day delay" of the trial.   In any event, this threat to generate delay through repetitive cross-examination does not create a genuine risk of undue delay that might warrant the Court taking the extraordinary step of excluding this highly relevant and important evidence.

The evidence relating to the defendant's sexual assault of Victim 4 is highly relevant and probative, and that probative value clearly outweighs any of the concerns addressed by Rule 403. As a result, even though this evidence may be prejudicial to the defense, it is not "unfairly" prejudicial, and therefore, it should be admissible under Rule 413.

### 3. The Evidence Relating to Victim 5 Meets the Rule 413 Standard for Admission

The Rule 413 evidence relating to Victim 5, who also lived in Hialeah, including the audio recording of the defendant and Victim 5 engaging in sexual conduct while the defendant's police radio can be heard in the background, was set forth in detail in the government's original Notice, DE 37 at 9-11.   In summary, Victim 5, who was only 19 at the time, was walking to her gym in Hialeah one night in November 2014 when the defendant, in uniform and in his marked police vehicle, used his police authority to force her to enter his car under the premise of driving her to her gym.   Once in the car, he instead drove in a different direction to a secluded dark alley, got out of the car, pulled down his pants and forced her to perform oral sex on him, followed by sexual

intercourse.   Alone and afraid, Victim 5 played along after the defendant pushed sex on her and engaged in friendly banter as he drove her back towards her home after the incident.

Seeking to exclude this highly relevant evidence, the defendant asserts that it fails to satisfy the second threshold requirement for admission under Rule 413 because it is not evidence of a sexual assault.   He argues that the evidence refutes Victim 5's claim that this was a non-consensual encounter and goes on to state that "the government's position that the mere fact that the Defendant was a police officer and therefore any sexual encounter is a non-consensual submission to authority is a misinterpretation of the law."   DE 76 at 31.   However, these defense arguments ignore the portions of Victim 5's statements that contradict the defendant's position and seriously misrepresent the government's position, which bases the admissibility of Victim 5's evidence on the specific circumstances of her encounter with the defendant, and not, as the defendant claims, on the view that any sexual encounter with a police officer "is a non-consensual submission to authority . . . ."   DE 76 at 31.

Taken as a whole, the evidence relating to Victim 5 does not show that this was simply a consensual sexual encounter at night in a deserted Hialeah alley between an almost 27-year-old police officer, on duty, in uniform, armed, and in his marked unit, and a 19-year-old girl who was a stranger to him prior to that encounter.   Rather, as Victim 5 has explained, she was a young woman walking to her gym alone at night in Hialeah who was ultimately compelled by the defendant to get into his police car.   The defendant first took a friendly approach with her, asking why she was walking alone in an area he said was unsafe and offering to drive her to her gym for safety.   When she refused his offer, he moved to coercion, accusing her of prowling and insisting she enter the car.   Once Victim 5 got into the front passenger seat of the car, the defendant did not drive her to the gym, but instead drove away from the area in a different direction.   As he was

driving, the defendant was also touching Victim 5's legs and groping her breast as she sat silently in fear.   He ultimately parked in a deserted dark alley.   In that alley, he pulled down his pants and forced her head to his genital area to perform oral sex on him before pulling down her pants and engaging in sexual intercourse with her, conduct clearly captured on the audio recording.

As heard in the audio recording, after having sexual intercourse with her, the defendant asked Victim 5 her age and commented that she was "young" after she said she was only 19.   The defendant is then heard on the recording telling Victim 5 that he was going to turn 27 "next Saturday," a date matching the defendant's birthday based on the date of the audio recording. As Victim 5 has explained in her statements, she was afraid of the defendant, and because of that fear, Victim 5 played along with the defendant after he pushed himself on her, during the sex, and on the ride back towards her home, all with the goal of getting home safely.[2]

Considering Victim 5's statements and the corroborating audio recording within the context of all the circumstances, there is no merit to the defendant's claim that "[b]ased simply on the discovery provided, without a single question on cross examination even being posed, no reasonable jury could find that this was anything other than a consensual encounter between adults."   DE 76 at 31-32.   To the contrary, Victim 5's statements show that this was anything but a consensual sexual encounter.   In fact, the account given by Victim 5 closely matches the conduct described by Victim 2 and Victim 3 of the defendant abusing his police position and authority to bring young women to isolated areas so that he could attempt to force them to engage in non-

---

[2] After this incident, Victim 5 had a limited number of other subsequent encounters with the defendant, including one where he came to the Publix she worked at in Hialeah and another incident where the defendant drove her to a secluded wooded location to have sexual intercourse.   Victim 5 has explained that she remained fearful of the defendant, who knew where she lived and worked, and it is for the jury, not the defendant, to decide what impact, if any, these subsequent encounters may have on their consideration of the value of Victim 5's testimony about the original sexual assault.

consensual sexual activity with him.    That is the most logical conclusion compelled by this highly relevant evidence, and as such, the evidence relating to Victim 5 should be admitted under Rule 413 to prove the defendant's propensity to commit the offenses charged in Count 2 of the Indictment and Count 1 of the Superseding Information.

The heart of the defendant's argument regarding Victim 5 appears to be that the Court does not even need to reach Rule 403 since it is not evidence of a sexual assault.    However, as with Victim 4, the defendant, with no meaningful elaboration, does claim that evidence relating to Victim 5 will cause delay and confuse the jury.[3]    These conclusory assertions have no merit.    As with Victim 4, this evidence consists primarily of the testimony of one witness—Victim 5—and the audio recording of the incident, which is less than 9 minutes in length.    Since Rule 413 was created to allow admission of this type of evidence, it makes no sense to then argue that the time needed to present the evidence establishing those other sexual assaults somehow creates undue delay under Rule 403.    Nor is there anything confusing about the jury hearing Victim 5 describe a sexual assault that is very similar to the conduct described by Victim 2 and Victim 3.

Like the evidence relating to Victim 4, the proffered evidence relating to the defendant's sexual assault of Victim 5 satisfies all the requirements for admission under Rule 413.    It is highly relevant and probative, and that probative value clearly outweighs any of the concerns addressed by Rule 403, and therefore, it should be admitted.

### B.    RULE 404(b)

The Rule 404(b) evidence concerning the Substation 5 videos and C.M. was summarized

---

[3]  Similar to what he did in labeling Victim 4's expected testimony as "salacious," the defendant appears to be attempting to support exclusion of Victim 5's evidence by describing the audio recording as "graphic and inherently prejudicial."  DE 76 at 31.  Since Rule 413 permits the admission of evidence of other sexual assaults, all such evidence is likely to be graphic, and so the defendant's use of that term adds nothing to the Court's consideration of the issue.

in the government's original Notice, DE 37 at 11-16, and the evidence regarding A.G. and D.R. was summarized in the government's Supplemental Notice, DE 57 at 2-7.[4]   Copies of the videos and additional information about C.M., A.G., and D.R. has been provided to the defendant in discovery.   The more detailed summaries in the original and Supplemental Notice are not repeated here, but are readopted in full.

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of any other crime, wrong, or other act is not admissible to prove a person's character" but may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."   Rule 404(b).   It is "a rule of inclusion which allows [for the admission of] prior bad acts evidence unless it tends to prove only criminal propensity."   *United States v. Gates*, 351 F. App'x 362, 367 (11th Cir. 2009).

In particular, courts have emphasized the importance of Rule 404(b) evidence in criminal civil rights cases charging § 242 violations, due to the government's need to prove that the defendant acted willfully.   *See United States v. Mohr*, 318 F.3d 613, 619 (4th Cir. 2003); *United States v. Rodella*, 101 F. Supp. 3d 1075, 1113-14 (D.N.M. 2015), *aff'd*, 804 F.3d 1317, 1334 (10th Cir. 2015); *see also* DE 49 at 4-6 (citing additional cases).   As this case involves the defendant's sexual conduct under color of law, the need for extrinsic evidence here is even higher than in many excessive force cases charged under § 242.   A typical excessive force case may involve the testimony of multiple law enforcement and civilian eyewitnesses, and with increasing frequency,

---

[4] As set forth in the Notice and above, DE 37 at 25 & n.15; *supra* at 2, the government intends to offer evidence of the defendant's sexual assaults of Victims 4 and Victim 5 under Rule 413, which permits the use of this evidence to prove the defendant's propensity to commit similar sexual assaults.   This same evidence is alternatively admissible under Rule 404(b) for the same non-propensity purposes for which the government is offering the evidence of the defendant's conduct with C.M., A.G., and D.R.: intent, opportunity, and *modus operandi*.

video recordings of the disputed events.   Here, in addition to proving that the defendant acted willfully, the government also must prove that the charged sexual conduct occurred and that it was nonconsensual—when, as is typical in cases related to sexual conduct, that behavior occurred outside of the presence of witnesses other than the defendant and victim.   The proffered evidence is thus needed to establish the defendant's intent, opportunity, plan, and *modus operandi*.

### 1.   The Government's Rule 404(b) Notice Meets the Requirements of the Revised Rule

The defendant asks the Court to strike the government's 404(b) Notice because he argues that Notice did not comply with a revision to Rule 404(b) that the defendant acknowledges did not take effect until months *after* the Notice was filed.[5]   DE 76 at 4-5.   The recently amended Rule 404(b) requires the government to state "the permitted purpose for which [it] intends to offer the evidence and the reasoning that supports the purpose."   Fed. R. Evid. 404(b)(3)(B).   Although the revised Rule was not in effect at the time, the combined 65 pages of briefing by the government on the subject nevertheless provided ample notice of the evidence the government is offering, the permitted purposes for which it is offering that evidence, and the reasoning supporting it.   DE 37, 49, 57.[6]

For example, both the initial Notice and Response explained that the government intended to offer evidence of the defendant's improper sexual relationship with police academy trainee C.M. to prove intent and *modus operandi*, and video evidence of the defendant bringing unidentified women into Substation 5 after hours and on weekends to prove *modus operandi*, opportunity, and

---

[5]  The defendant never once complained about the insufficiency of the government's Notice or Supplemental Notice before asking for the first time in his motion for the notices to be stricken as insufficient.

[6]  On August 4, 2021, the government emailed new defense counsel, flagging the Rule 413 and Rule 404(b) evidence and specifically referencing the Notice, Response, and Supplemental Response.   The government noted that it was doing so "in an abundance of caution since [counsel] are new to the case."

plan.   *See* DE 37 at 25-28; 49 at 6-13.   Both submissions also provided the government's reasoning in support of these permitted uses.   *Id.*

The Supplemental Notice reincorporated these prior arguments with respect to the newly discovered evidence of the defendant's interactions with A.G. and D.R., and specifically discussed the similarities of those events to the charged counts, demonstrating how this evidence further supports the defendant's *modus operandi*.   *See* DE 57 at 8-9.   The Supplemental Notice also reincorporated the Response.   *Id.* at 2.   The defendant therefore has sufficient notice of the proposed evidence, the purposes for which the government intends to use the evidence, and the law and reasoning supporting its admission, satisfying the requirements of the amended Rule 404(b).   That this notice was in fact effective is further supported by the defendant's failure to make any inquiry to government counsel about this point, and his Supplemental Response itself, which responded point by point to all of the proffered Rule 404(b) evidence.   DE 76.

2.   <u>**The Substation 5 Videos Are Properly Admissible Under Rule 404(b)**</u>

<u>Relevance of Videos:   Plan, Opportunity, *Modus Operandi*, and Rebutting Defenses</u>

The defendant argues that the 9 videos of the defendant escorting women into Substation 5 are not relevant and are "apropos of nothing."   DE 76 at 13.   As discussed in the Response, the videos, which depict the defendant, unaccompanied by any other officer, bringing in 9 other women after hours and on weekends, are relevant to show the defendant's plan and opportunity, *modus operandi*, and to rebut his likely defenses.

There is remarkable similarity between the Substation 5 videos and the charged conduct relating to Victim 1 and Victim 3, which makes the videos highly probative of the charged offenses.   *First*, Substation 5 was the exact same location where the defendant committed the offenses charged in Count 1 of the Indictment (involving Victim 1) and Count 1 of the Superseding

17

Information (involving Victim 3).  *Second*, they span the same time period:  the video recordings are of 9 separate occasions occurring between May 9, 2015, and June 13, 2015.  Notably, the defendant's conduct with respect to Victim 1 occurred on June 13, 2015, and his conduct involving Victim 3 occurred on May 31, 2015.  *Third*, Substation 5 was not regularly staffed or open to the public during the charged offenses (May 31, 2015 and June 13, 2015) or during the dates relating to the other women.[7]  *Fourth*, in the videos, the defendant is in uniform, armed with his firearm, and working his shift as the sergeant on duty in patrol, just like he was when he encountered Victims 1-3.  *Fifth*, the captured footage of the defendant's conduct is identical to his interactions with Victims 1 and 3:  the defendant, acting alone, escorted young women into Substation 5 and then into areas that are out of surveillance camera view, such as the roll call room where the sergeants' offices are located or the bathroom.  *Sixth*, the young women all left Substation 5, shortly after entering with the defendant, on their own accord; none were arrested.  *Lastly*, there is no corresponding incident report for any of the other incidents depicted in the videos, just as there are no police records of the defendant's interaction with Victim 1.

These similarities are therefore relevant to show the defendant's plan and opportunity to bring young women into an unstaffed substation to commit the charged offenses relating to Victim 1 and Victim 3.  The videos show that he had unfettered access, privacy, and security at Substation 5, while in uniform and armed, and could therefore exert his authority under color of law to unreasonably search and seize Victims 1 and 3.  *See United States v. Morris*, 494 F. App'x 574, 586 (6th Cir. 2012) (affirming evidence of defendant's encounter with another woman as similar

---

[7] Contrary to the defendant's claims, DE 76 at 13, 14, the government has never described Substation 5 as "little more than an abandoned shack" or "some out of the way, abandoned and unused police structure." Rather, the government has simply pointed to the fact that Substation 5 was not staffed or open to the public during the times and dates when the defendant brought in Victim 1, Victim 3, and the other 9 women.

act evidence under Rule 404(b):   "the relevance of the [prior] incident is that . . . it shows that [defendant] had formulated a plan to isolate women for the purpose of using his position as a law enforcement officer to cause them to engage in sexual conduct to which they would not otherwise have consented").

Moreover, the videos also show that the defendant's *modus operandi* was to bring young women, while he was on duty, on the weekends or after hours, into Substation 5, which during those times was unstaffed.   Since Substation 5 was unstaffed during those hours, it provided the opportunity to avoid encountering other officers while he escorted the women to rooms with no surveillance cameras, entered alone with them, and then escorted them back out of the substation, without arresting them—all of which is consistent with the charged conduct related to Victim 1. It was also his *modus operandi* to not follow HPD protocol in documenting any of these encounters, which was consistent with his decision not to document Victim 1's incident at all. The distinct similarities of the videos to the charged conduct in this case weigh strongly in favor of admissibility.   *See United States v. Gonzalez*, 533 F.3d 1057, 1064 (9th Cir. 2008).   In *Gonzalez*, the defendant was on trial for assaulting three women in violation of § 242 and the prosecution introduced testimony under Rule 404(b) from two other women establishing *modus operandi*.   *Id.* at 1063.   In affirming, the Ninth Circuit held that *modus operandi* entailed "being a police officer armed with a badge and a gun" who consistently approached his victims in the same manner, would establish a conversation with the victims about their families or personal relationships, would command the victims to "sit, squat, stand, or undress," and would then release them without arrest or citation.   *Id.* at 1063-64 ("Beyond propensity, the evidence established a way of behavior that could be reasonably relied upon by a juror to convict [defendant] of the charged offenses.").

Lastly, the videos are relevant to rebut his likely defense that the lack of documentation relating to Victim 1's incident was a mistake, bad decision, or sloppy police work.   He will likely claim that he encountered Victim 1 as part of his official duties and legitimate police work, and for some reason failed to document this one incident.   However, the video recordings of 9 other instances where he escorted women into Substation 5 but consistently failed to document these specific encounters—yet documented other police activities on those days—show that he was intentionally not documenting these instances because they were not legitimate police encounters. The consistent lack of documentation shows that he did not want his encounters to be discovered precisely because he knew that escorting women into the Substation alone without documenting it was against HPD policy—which is proof of willfulness, an essential element of 18 U.S.C. § 242. Without the 9 other occasions where the defendant failed to document his encounters with the women he escorted into Substation 5, the government cannot effectively rebut this likely defense and show this compelling evidence of willfulness.   *United States v. Simmons*, 470 F.3d 1115, 1125-26 (5th Cir. 2006) (affirming admission of Rule 404(b) evidence, defendant's failure to log marijuana seized during traffic stop of victim, as "integral to the events leading to [victim]'s sexual assault," and corroborative of her testimony, and suggesting defendant did not want his police department's attention turned to the victim, in § 242 sexual assault case).

The probative value of the video recordings is not *substantially outweighed* by unfair prejudice.   There is nothing inflammatory or salacious on the videos, as they just show the defendant bringing women into Substation 5 and taking them out of view.   Any prejudice arising from the introduction of the videos will be slight, particularly in light of the graphic and sensitive nature of the testimony that the victims in this case will provide.   The jury will have already heard about the incidents involving Victims 1, 2, and 3—conduct which involves asking Victim 1, a

minor in his custody, to remove her shorts and underwear; exposing his bare penis to Victim 2, placing her hand on it, and kissing her; and inducing Victim 3 to perform oral sex on him.

Oddly, the defendant argues that "[b]y showing these videos to the jury the government can simply imply without corroboration that on each of these occasions the Defendant engaged in some illegal activity, which is also completely unknown." DE 76 at 14. This argument ignores the government's prior representation that it would not make any such arguments. Specifically, the government stated:

> The government will not argue that the defendant sexually assaulted any of those other women depicted in the videos . . . . Because the defendant did not document those encounters, law enforcement was unable to identify them despite their investigative efforts, and so the defendant's actions with them are not known. The video recordings will only be relevant to show the defendant's plan, opportunity, and method of violating the civil rights of Victims 1-3 to obtain his own sexual gratification.

See Response, DE 49 at 17-18 (emphasis in original).

The defendant further argues that the videos are more prejudicial than probative because they were "cherry-picked" by HPD and it is possible that a more thorough review would show the defendant entering the Substation accompanying men. DE 76 at 15. The videos came to light after Victim 1 filed an official complaint with HPD several hours after her encounter with the defendant. HPD's Professional Compliance Bureau (PCB) then commenced an investigation. During that investigation, PCB detectives reviewed the defendant's key card entries in correlation with surveillance video from Substation 5 and discovered that he was captured on video escorting 11 women into the roll call room where the sergeant's offices are located, with no corresponding incident report, on 9 different dates. Victim 1 and Victim 3 are captured on these videos, but the other women remain unidentified because the defendant did not document these encounters.

The FBI interviewed the detective who was on the original PCB investigation and reviewed

the videos.[8]   That detective stated that he and an IT employee reviewed the videos minute by minute, play-by-play, and that he did not recall observing the defendant bringing males to Substation 5 on any videos identified from the key card entries.   That detective noted that these videos that were submitted to PCB were the only videos that PCB believed existed, and on all of them the defendant was escorting a woman into Substation 5.   The defendant's hopeful speculation does not change the facts that the PCB detectives who reviewed the videos only found videos of him escorting females into Substation 5.

<u>Substation 5 Was Not a "Fully Functional Police Location"</u>

The defendant asserts that "Substation 5 is a remote location for the Hialeah Police Department.   It was and remains a fully functional police location."   DE 76 at 13.   This is factually incorrect.   Interviews of multiple HPD law enforcement officers—both officers assigned to patrol and command staff—reveal that Substation 5 was primarily utilized for administrative paperwork and roll call.   Officers were also permitted to eat lunch at Substation 5, drop off reports, and park personal vehicles in order to pick up their marked police vehicles.   Detainees were not processed at Substation 5.   Detainees were transported to the main HPD station.   Thus, Substation 5 was not a "fully functional police station" where normal police activity, including the investigation of incidents or the processing of detainees, was conducted.   It was a substation with a specific, limited use for officers' administrative duties, not for interfacing with the public.   The government has never asserted that Substation 5 was an "abandoned and unused police structure," DE 76 at 14, as the defendant claims, but has simply noted its limited use.   The defendant also notes that the videos "show multiple police cruisers parked in the parking lot indicating that the substation is both active and populated."   This fact is immaterial:   officers were authorized to

---

[8] The 302 of that interview has been previously provided in discovery.

perform administrative duties at Substation 5, but detainees or private citizens were not to be transported there.

Identity of Defendant on Videos

The defendant also claims that the videos show "a person, which the government believes to be the Defendant" and that "it is not possible to positively identify the Defendant from the video." DE 76 at 12; 13 n.4. This new argument simply ignores the compelling evidence establishing that it is unquestionably the defendant on these videos. The videos are not high-definition videos, but they do capture the images of the defendant in uniform, including those in which a portion of his distinctive arm tattoos can be seen. At the times the defendant appears on video, he was the sergeant on duty on that date and time in Sector 5. Furthermore, the HPD PCB detective who investigated the incident relating to Victim 1, and who was in a much better position to identify his colleague, discovered these videos and documented that it was the defendant on them. Notably, HPD records show that this investigation into the defendant resulted in a "sustained" complaint for "conduct unbecoming/improper procedure," as noted in his official personnel records. For the defendant to now claim that it was not him but a "person, which the government believes to be the Defendant" is completely devoid of merit.

Additionally, the records of the defendant's key card entries are detailed: they show his name, badge number, date, time (to the second), sector (i.e., Sector 5), and the exact sub-location within that Sector where he swiped his badge to gain access to that part of Substation 5. A comparison of the defendant's key card activities with the videos confirms that it was the defendant escorting these women into, and out of, Substation 5.

In sum, the videos of Substation 5 are significant evidence showing the defendant's plan, opportunity, and method of abusing his police position during the same timeframe. As such, the

probative value of this evidence is high.

### 3.  __The Evidence Relating to C.M. Is Properly Admissible Under Rule 404(b)__

The defendant contests the admission of evidence regarding his improper sexual relationship with trainee C.M., arguing that it is insufficiently relevant because it was consensual and because the defendant did not hold a position of authority over her.   DE 76 at 9-11.   However, the defendant's attempt to cast the defendant as merely "a recruiter and a physical training officer" with no real ability to impact C.M.'s academy success or future prospects ignores the reality of the situation.

First, the defendant supervised physical training at the police academy, where he directed and evaluated C.M. and her classmates.   Even though the defendant did not provide classroom instruction, participation in physical training was an academy requirement, and a trainee's fitness evaluations certainly could impact their employment prospects.

Second, and perhaps even more importantly, the defendant also served as an HPD recruiter at the academy.   C.M., like many of the students there, paid to attend the academy in the hopes of finding a job with a police department after she graduated.   As a recruiter who also instructed the students in their physical training and saw them every day, the defendant was well-placed to evaluate their fitness (physical and otherwise) for a position at HPD.   Moreover, as C.M. has explained, *see* DE 37 at 12, the defendant actually used his influence at HPD to build his relationship with C.M.   C.M. will testify that the defendant told her that he would observe their class and select the best candidates for his department.   He would then assist those candidates with the application process.   Indeed, the defendant initially lured C.M. to his car where they first engaged in sexual intercourse by telling her that he wanted to speak with her privately about the application process.   C.M. will also testify that she witnessed the defendant provide his opinions

about the qualifications of trainees to recruiters from other local police departments, thus impacting the trainees' employment prospects beyond HPD.   As both a physical training instructor and a recruiter, the defendant held a position of power over C.M., a trainee looking for a job the defendant was well-placed to either help her obtain or prevent her from obtaining.[9]

This position of authority and influence over C.M. is what makes the defendant's sexual relationship with her relevant evidence of the defendant's intent.   As previously explained in the Notice and Response, the defendant's relationship with C.M. demonstrates that he misused this position of authority to secure sexual gratification from C.M.

The defendant knew that initiating a sexual relationship with a trainee was wrong and against the rules, yet chose to pursue such a relationship anyway.   That disregard for the rules in order to obtain sexual gratification from a young woman over whom he had authority is the same intent the government must prove to establish the charged conduct.   *See United States v. Lanier*, 520 U.S. 259, 264 (1997) (to establish a 18 U.S.C. § 242 violation, the government must prove that the defendant acted "willfully"); *Screws v. United States*, 325 U.S. 91, 104 (1945) (defining a willful act as one that a defendant takes knowing or in reckless disregard of the fact that his conduct is forbidden); Eleventh Cir. Pattern Jury Instr. § B9.1A (defining willfully as an act that was "committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law").   Similar acts evidence in other § 242 cases is routinely admitted for the purpose of proving that a defendant acted willfully.   *See, e.g.*, *Mohr*, 318 F.3d at 619; Response, DE 49 at 7 (citing cases).

As discussed previously in the Response, DE 49 at 8-9, and incorporated here by reference,

---

[9] As the government detailed in its original Notice, once C.M. became pregnant, the defendant told her that if she ever told anyone about their relationship or the pregnancy, he would call all his connections with other police departments and tell them not to hire her.   DE 37 at 13.

the evidence that the defendant abused his position as an HPD recruiter and academy trainer over C.M. to obtain sexual gratification from her is sufficiently similar to the charged conduct to be relevant and admissible.   That C.M. consented to sex with the defendant, who held a position of authority and influence over her and made clear that he was in a position to help her obtain the job she desired, does not diminish its relevance.

C.M.'s testimony, corroborated by text and WhatsApp messages, establishes that she and the defendant engaged in sexual intercourse.   C.M. has previously testified under oath on this subject, and her testimony is corroborated by the contemporaneous and explicit WhatsApp messages she and the defendant exchanged discussing particular sex acts in which they engaged. Contrary to the defendant's suggestion, DE 76 at 11, this evidence establishes the existence of this relationship by more than the required preponderance of the evidence standard.   *See United States v. Bowe*, 221 F.3d 1183, 1192 (11th Cir. 2000) (explaining that "[i]n this circuit, the uncorroborated word of an accomplice . . . provides a sufficient basis for concluding that the defendant committed the extrinsic acts admissible under Rule 404(b)").

The defendant also argues both that C.M. has previously denied the relationship, and that the evidence fails to support the contention that the defendant pressured her to deny their relationship and to have an abortion.   DE 76 at 11-12.   To the extent the defendant challenges C.M.'s account based on alleged inconsistencies, those challenges are appropriate fodder for cross-examination, but do not affect the admissibility of C.M.'s testimony.   *See Bowe*, 211 F.3d at 1192 (admitting uncorroborated testimony of a Rule 404(b) witness and explaining that her testimony satisfied the preponderance of the evidence standard when the accomplice provided "detailed and specific" testimony "both on direct and cross-examination").   Here, however, the discovery already contains C.M.'s "detailed and specific" answers that she provided in her sworn testimony.

Under pressure from the defendant, C.M. *did* deny the existence of their relationship, in writing to the police academy, in order to protect the defendant's employment, even as she resigned her own position as a trainee.   Indeed, C.M. will testify that the defendant dictated to her what she should write in her denial and then reviewed it before she submitted it to the academy's administrators to ensure she had done what he had directed.   C.M. will also testify that the defendant would pressure her more directly in-person and on phone calls, both about the abortion and her resignation letter, and would sometimes ask C.M. for her phone to delete messages they had exchanged.

Taken as a whole, the evidence relating to C.M. far exceeds the preponderance standard and satisfies the requirements for admission under Rule 404(b) for the purposes of proving the defendant's intent and *modus operandi*.

### 4.  The Evidence Relating to A.G. and D.R. Is Relevant to Show Intent and Opportunity

Both A.G.'s and D.R.'s encounters are relevant to show intent and opportunity and thus are properly admissible under Rule 404(b).

The defendant stopped A.G.'s car for a minor infraction and told her he would follow her to her destination because she may be stopped again due to the problem with her car's registration. Once they arrived at the destination where A.G. was to pick up her young children, the defendant called A.G. to his car and told her to get in so they could go to the corner.   The defendant was flirtatious in his manner and not professional.

As for D.R., he encountered her in a group of high school students smoking marijuana at or near a park.   The defendant separated D.R. from her friends and told the other officers that they did not need to speak with her because he was dealing with her.   He was flirtatious with her.   He then transported her home and inquired who resided with her.   D.R. feared being raped by the

27

defendant.   She then received a text message and two phone calls, which she believed were from him.

Both incidents involved the defendant misusing his police position and authority to provide him with an *opportunity* to isolate and detain young women under his control to proposition them for sexual favors under the guise of allowing them to avoid legal trouble.   This is remarkably similar to the charged conduct and his conduct with Victim 4 and Victim 5.   He separated D.R. from her friends and the other HPD officers, just as he separated Victim 1 from her girlfriend in the car and transported her alone to Substation 5; separated Victim 2 from her two friends in the car, told her to exit the car, wait for him by his car and directed her two friends to drive away; and separated Victim 3 from her boyfriend and the other officers at Substation 5.   As a sergeant, the defendant had the opportunity to isolate these women for his own prurient interests and command his subordinate officers accordingly.

Moreover, in each encounter, he used his control over the women to attempt to secure sexual gratification from them.   It is precisely this *intent* that the government must prove:   that the defendant willfully misused his police position and authority to demand sexual gratification from young women.   The commonality between the three charged incidents and the incidents involving A.G., D.R., Victim 4, and Victim 5 is evident in the defendant's interactions with these women, all of whom had some perceived or actual problem with the law that enabled him to exploit that vulnerability to exert his official authority and seek sexual gratification from them.   Notably, A.G. had a problem with her car's registration; D.R. was in a group of high school students smoking marijuana at a park; Victim 5 was supposedly "prowling" while walking to the gym; Victim 4 was out after her court-ordered curfew imposed because she was a minor with behavioral issues who was being placed in foster care; Victim 3 had to be Baker Acted given her self-harming

28

acts; Victim 2 had just entered her friend's car when he drove up with activated lights and siren and ordered her out and the friends to drive away; Victim 1 was stopped for some unknown and undocumented reason while driving in a parking lot, ordered out of her car, and transported to Substation 5.

In all these situations, he approached the victims in his capacity as a police officer, noted how they were or could be in some trouble with the law, and then attempted to obtain sexual favors. Furthermore, the defendant did not document his interaction with D.R. at the initial location or subsequently when transporting her home, in contravention to HPD policy, just as he failed to document his stop of Victim 1 and her subsequent transport to Substation 5.   These omissions demonstrate the defendant's willfulness.   Thus, the evidence relating to A.G. and D.R. is relevant to and highly probative of intent and opportunity.   *See Mohr*, 318 F.3d at 619 (holding the other act evidence was probative of willfulness, particularly because the defendant disputed her intent at trial); *United States v. Rodella*, 804 F.3d 1317, 1334 (10th Cir. 2015) (affirming admission of evidence establishing defendant's involvement in three incidents offered to establish defendant's motive and intent); *United States v. Hollingsworth*, 2010 WL 3385349, at *5-6 (E.D. Ky. Aug. 25, 2010) (admitting various extrinsic acts under Rule 404(b) as relevant to plan, motive, and intent). Notably, the defendant has put his intent at issue by pleading not guilty and the encounters with A.G. and D.R. are evidence of his intent.   *See United States v. Hardy*, 520 F. App'x 835, 840 (11th Cir. 2013) ("examining the first prong of the Rule 404(b) analysis, [the defendant] rendered his intent a material issue by pleading not guilty.").

Prejudice

The probative value of this evidence is not substantially outweighed by undue prejudice. The encounters with A.G. and D.R. are similar to the charged conduct, yet far less graphic, and

occurred around the same time.   In fact, the defendant argues that the encounter with A.G. is "rather uneventful."   DE 76 at 16.   Contrary to the defendant's assertion, a police officer soliciting a woman he has just stopped and cited to then "go to the corner" with him is neither "uneventful" or routine.   However, this characterization does undercut his claim that this same evidence also is "significantly prejudicial."   DE 76 at 16.   While the evidence is prejudicial, as is the case with all relevant evidence offered by the government, it is not unduly prejudicial, as the defendant tacitly has admitted in describing the encounter as "uneventful."

Similarly, the defendant argues that D.R.'s testimony would be "wildly prejudicial" because it "would imply to a jury that the Defendant wanted to engage in some improper interaction with D.R., a high school student."   DE 76 at 21.   Notably, the jury will have already heard from Victim 1, who was a minor (17 years old) when the defendant stopped her car, transported her in his police car to Substation 5, escorted her into a private area, and directed her to remove her shorts and underwear while touching his genitals.   In contrast, D.R.'s encounter does not carry a risk of unfair prejudice.

The defendant also argues that he would be prejudiced because D.R.'s "encounter was so remote in time."   DE 76 at 21.   The defendant misunderstands the temporal remoteness analysis that is part of the Rule 404(b) framework.   Remoteness is measured between the charged conduct and the extrinsic act, not the extrinsic act and the time of trial.   Here, D.R.'s encounter occurred in the spring of 2015 and the charged conduct all occurred in the first half of 2015.   As such, there is no remoteness concern because both the charged conduct and the Rule 404(b) evidence occurred at the same time.

Last, the testimony of A.G. and D.R. will be very brief, given the brevity of their encounters, and not "extend[] an already lengthy trial," DE 76 at 16, as noted below.   *See supra*

A.2. at 10-11, 14 & C.1, infra at 31-33.

## C.  DELAY AND CONFUSION

The defendant also asserts that admitting the proffered Rule 413 and Rule 404(b) evidence would cause significant delay and confusion.   In support of his position, the defendant claims that this evidence includes not only the two Rule 413 victims (Victim 4 and Victim 5) and the three direct Rule 404(b) witnesses (C.M., A.G., and D.R.), but also 72 videos and seven hearsay witnesses in support of the 404(b) evidence.   He further claims that at the most recent status conference on August 23, 2021, the government advised that the trial now was expected to last six weeks as opposed to the original projection of six days, all with the goal of portraying the proffered Rule 413 and 404(b) evidence as grossly out of proportion to the evidence of the charged conduct. Finally, he asserts that the limiting instruction that would be needed if this evidence is admitted would be too confusing and complicated for any jury to understand.   The Court should reject this effort to exclude the evidence because it inaccurately portrays both the facts of the case and the controlling law.

### 1.  **Delay**

Contrary to the defendant's assertion, the government is not seeking to admit 72 videos. As previously explained in the original Notice, DE 37 at 14-16, the 9 videos being offered under Rule 404(b) show the Substation 5 multi-camera surveillance views capturing the defendant's afterhours and/or weekend encounters with 9 women during May and June 2015.   While each of the 9 videos simultaneously contains multiple camera views, that does not change the fact that there are 9, not 72, videos, being offered.[10]

---

[10] To the extent that the defendant has added up each camera view to reach a total of 72 (perhaps because for ease of review, the government converted each view into a separate video file in a "click and play" format, viewable outside of the software (also provided) required to play them simultaneously), and is now

Each of these videos lasts only approximately 15 minutes including the periods of time when the defendant and women in the undocumented encounters have gone into areas out of camera view.   Assuming the Court will allow their admission, the government likely would seek to admit the videos in their entirety but not play this "out of view" time before the jury, making the government's actual trial presentation of the videos even shorter in duration.   Yet even if all 9 videos were played in their entirety, they would not delay the trial or overwhelm the other evidence proving the charges.

The defendant's meritless assertion that the government is seeking to introduce 72 videos under Rule 404(b) appears to be the centerpiece of their claim that "there is an 82:3 ratio in favor of extrinsic uncharged evidence to actual alleged victims . . . ."   DE 76 at 32.   Aside from being factually inaccurate, this "ratio" of supposed evidence to victims is meaningless.   The direct evidence proving the three charged civil rights violations will include the three victims, multiple other witnesses, video evidence, and relevant documentary evidence.   This evidence will without question be the largest part of the government's evidence, supported as the Court allows by the Rule 413 and Rule 404(b) evidence described and/or elaborated upon in the original Notice, the original Response, and the Supplemental Notice.[11]   If the defendant is implying or asserting through its "82:3" ratio that the government is trying to offer over 27 times more Rule 413 and Rule 404(b) evidence than evidence pertaining directly to the charged conduct, that is simply untrue.

---

portraying multiple views within a single video as being separate "videos," that is not an accurate portrayal of how the evidence would be offered.

[11] The defendant also states that the government wants to offer seven Rule 404(b) witnesses to provide hearsay testimony.   DE 76 at 32.   However, the defendant ignores the fact that in its Supplemental Notice, the government acknowledged the limitations of the hearsay rules while describing circumstances that might occur during trial that would make some of that testimony admissible.   DE 57 at 4 n.5.

Finally, the defendant makes the assertion that the government advised at the August 23, 2021 status conference that it now anticipates the trial to last six weeks.  DE 76 at 32.  The government has never taken the position that this trial will last six weeks, and the undersigned have no recollection of making this statement.   To the contrary, the government's projection was that the trial would take approximately two to three weeks factoring in the unknowns of the continuing impact, if any, of COVID, and the time-consuming but preferable process of having prospective jurors fill out their lengthy questionnaires upon arrival for their first day of service. To the best of the government's collective recall, the Court stated that it would plan for a possible three-week trial for scheduling purposes in an abundance of caution.[12]

## 2.  **Confusion**

The defendant next asserts that while he would be entitled to limiting instructions to mitigate any possible risks of undue prejudice from the evidence proffered by the government, it is beyond the capacity of the Court and parties to fashion such instructions.   Instead, the defendant simply assumes any instruction would be useless and confusing and beyond the jurors' capacity to understand.   Looking past its hyperbole and phrases such as "magical jury instruction," DE 76 at 33, the defendant's argument on this point lacks merit.

First, as the government explained in its original Notice, DE 37 at 31, courts regularly use limiting instructions in the Rule 404(b) setting, and sometimes even use multiple limiting instructions.  *See United States v. Jernigan*, 341 F.3d 1273, 1282 (11th Cir. 2003) (in case where district court gave the jury two separate limiting instructions regarding the impermissibility of considering defendant's previous convictions as propensity evidence, any "unfair prejudice that

---

[12] Upon reviewing DE 76 and seeing this claim, the government ordered the transcript of the August 23, 2021 status conference.  This transcript will not be available until mid-November, but hopefully will be received in time for the November 19, 2021 hearing on the Rule 413/Rule 404(b) issue.

may have existed was mitigated by the district judge's limiting instruction."); *see also United States v. Chappelle*, 735 F. App'x 644, 648 (11th Cir. 2018) ("We acknowledge that this evidence [of THC lollipop] was somewhat prejudicial.  But the district court mitigated such risk by twice giving the jury limiting instructions as to the proper use of the evidence."); *United States v. Levinson*, 504 F. App'x 824, 828 (11th Cir. 2013) ("the jury was instructed for the chats and child pornography to consider the evidence only for the purpose of determining whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment.  The court actually gave multiple limiting instructions, including a final Rule 404(b) instruction.").

Setting aside his conclusory assertions, the defendant cites to nothing so unique about this case to change that well-established practice, and there is nothing.  The only instruction that will be needed in addition to the traditional limiting instruction for any Rule 404(b) evidence admitted will be a simple instruction telling the jurors that the evidence regarding Victim 4 and Victim 5 can only be considered to prove propensity for the charges involving Victim 2 and Victim 3, although it can be used for other accepted Rule 404(b) purposes for all three charges.

Moreover, courts regularly use limiting instructions in even more complicated settings, such as instructing jurors only to consider evidence as to certain defendants or counts in complicated multi-defendant cases.  *See United States v. Hill*, 643 F.3d 807, 829 (11th Cir. 2011) (jury presumed to follow instruction to consider evidence separately as to each defendant with respect to each charge in joint trial of twelve defendants on varying charges within 187-count indictment).  In addition, despite the defendant's assumption to the contrary, it is well-settled law in the Eleventh Circuit based on Supreme Court precedent that a court must presume that the jury will follow the court's instructions, including any limiting instructions given regarding the Rule 413 and Rule 404(b) evidence:  "We have obediently followed and repeated the Supreme Court's

direction that we presume juries follow their instructions."   *United States v. Roy*, 855 F.3d 1133,

1187 (11th Cir. 2017) (*en banc*) (relying on *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)

and collecting Supreme Court and Eleventh Circuit cases).

     **D.   <u>An Evidentiary Hearing Is Neither Needed Nor Required</u>**

     In his Objections, the defendant adopts and renews his previous request for an evidentiary

hearing on the government's Rule 404(b) and Rule 413 evidence.   DE 40 at 9; DE 76 at 2, 34.

The defendant provides no support for his request.   In the government's Response, the

government cited *Huddleston v. United States*, in which the Supreme Court explained that

requiring an evidentiary hearing on the admissibility of Rule 404(b) evidence is "inconsistent with

the structure of the Rules of Evidence and with the plain language of Rule 404(b)."   485 U.S. 681,

687 (1988).   The government then distinguished the cases that prior defense counsel cited.

Current counsel provides no additional authority and does not address the government's previously

cited caselaw.   Indeed, the defendant's current motion only mentions the evidentiary hearing in a

cursory fashion—first in its recital of the procedural history and then on its penultimate page, in

the "WHEREFORE" paragraph: "and hereby adopts and renews his previous request for an

evidentiary hearing."   DE 76 at 2, 34.   The proffered Rule 413 and 404(b) evidence clearly is

relevant and admissible, and as such, there is no need for an evidentiary hearing, and none is

required by the Federal Rules of Evidence or the caselaw.

     **III.   CONCLUSION**

     The government requests that it be permitted to present the evidence described in its

original and supplemental Notices, pursuant to Rules 413 and 404(b), as it is relevant and

admissible.   Further, this Court should deny the defendant's request for an evidentiary hearing, as

a hearing is neither necessary nor helpful to determining the admissibility of the evidence.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

*s/ Edward N. Stamm*
EDWARD N. STAMM
FL Bar No. 373826
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, FL 33132
Tel: (305) 961-9164
edward.stamm@usdoj.gov


*s/ Ilham Hosseini*
ILHAM HOSSEINI
Court ID No. A5501904
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 NE 4th Street
Miami, FL 33132
Tel: (305) 961-9297
ilham.hosseini@usdoj.gov

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL

*s/ Samantha Trepel*
SAMANTHA TREPEL
Court ID No. A5501689
Special Litigation Counsel
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
Tel: (202) 305-3204
samantha.trepel@usdoj.gov