IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-20822-CR-WILLIAMS

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| Plaintiff, | § |
| vs. | § |
| JESUS MANUEL MENOCAL, JR., | § |
| Defendants. | § |
| _____/ | |

**SENTENCING MEMORANDUM AND MATERIALS OFFERED IN SUPPORT OF DEFENDANT'S MOTION FOR A DOWNWARD VARIANCE**

**COMES NOW,** the Defendant, Jesus Menocal, Jr., by and through his undersigned counsel, and submits this sentencing memorandum in support of his request for a below guideline sentence which conforms to the Supreme Court's directive "instructing district courts to impose a sentence sufficient but not greater than necessary" to achieve the goals of sentencing set forth in 18 U.S.C. §3553(a). Kimbrough v. United States, 128 S.Ct. 558 (2007). This goal of reducing incarceration and therefore the length of sentences was recently reiterated by the enactment of the First Step Act in 2018.

**INTRODUCTION**

Attached to this memorandum as composite Exhibit A are attestations from 73 (seventy-three) upstanding members of our community. In summary, there are three categories of letter writers: family, colleagues, and friends. Some belong in all three categories and some who are not, for example family, but "feel" as if they are and therefore belong in all three. All of them echo the



following sentiments- Jesse is an incredibly dedicated and devoted father and family man, he was equally dedicated and passionate about his career as a law enforcement officer, and he is extremely remorseful and will rise again to be a productive member of our community. His rise among the law enforcement community was remarkable, making his banishment from it that much more significant. He was born and raised to follow in his father and uncle's footsteps. All he ever wanted to be was a law enforcement officer. He entered the academy at the youthful age of 19 for all the right reasons with all the passion necessary to do the job. He put in the time, the energy, and the work. He helped his community and at the same time received the recognition for his work. He was nominated as officer of the year and the many commendations and awards (attached hereto as composite Exhibit B) reflected all the work he put in. With all that came pressure and scrutiny and as sure as the rise came, so did the fall. The product of immature masculinity? A toxic culture? It is difficult, as everyone who knows him attests to reconcile the person they know with the defendant before this court. But again, what all 71 of them affirm and agree upon is that despite this case they know Jesse Menocal and that at his core he is a kind person who never misses an opportunity to give back and serve and that he has so much capacity to do good that they are sure he will once again be a productive member of society if given the chance. Retired Detective Sergeant Denis Morales in a quote from Audrey Hepburn summarizes the need for redemption and why the court's focus can and should be toward returning Jessie back to his community "[P]eople, even more than things, have to be restored, renewed, revived, reclaimed, and redeemed; never throw out anyone". Certainly, the facts of this case are troubling to say the least but when compared to decades of good deeds and a life dedicated to serving his community, this court should look not just at the facts surrounding the offense but the facts about Jessie as a man, a father, a husband, a



son and see that he can be redeemed. At a minimum the way Jessie has led his life, but for a very brief and anomalous period of time, he has earned a second chance.

It is this court's responsibility to fashion a sentence that considers many factors, and it is the intent of this pleading to assist by allowing the court to be fully briefed on the history and characteristics of this Defendant. This court is guided by precedent and statute to consider not only the offense conduct but the person. Accordingly, the letters attached, and this memorandum are offered in support of our request for a sentence that involves alternative incarceration including a combination of halfway house and home detention. While such a request given the nature of the facts of this case may initially seem insufficient, when considered in light of the factors set forth in 18 U.S.C. §3553(a), especially the outpouring of support contained in Exhibit A, and the fact that the Defendant has been adjudicated on misdemeanor counts it is not only reasonable, but appropriate. In conjunction with the directives of the higher courts about what trial judges should consider in determining what is the least restrictive sentence a court can pronounce as set forth in 18 U.S.C. 3553(a):

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Gall v. United States, 128 S. Ct. 586, 598 (2007), *quoting* Koon v. United States, 518 U.S. 81, 113 (1996).

The seminal case United States v. Booker, 543 U.S. 220 (2005), 18 U.S.C. section 3553(a), the Policy Statements and Applications notes to 5C1.1 of the United States Sentencing Guidelines, The Second Chance Act (SCA) signed into law by President George W. Bush and codified at 18 U.S.C. Section 3624(c)(1), Aberrant Behavior Departures listed at 5K2.20 of the United States

Sentencing Guidelines and all the factors described below not only permit but sanction this court to consider imposing a sentence other than a sentence of imprisonment for first offenders.

### JESSIE MENOCAL

Jesus Manuel Menocal, Jr. (hereinafter "Jessie" or "Defendant"), is a 34 year old father of two amazing children. He has been married to his wife Jescenia for 8 years (it will be 9 in July of this year) and they have two beautiful children, a son, age 8, and a daughter, age 4. He was raised in South Florida in a loving and supportive home. His father, who he is named after, is a lifetime law enforcement officer and is Jessie's idol and hero. In his own words Jessie describes him as "the best". His mother, Elizabeth, is the rock of the family. He has a brother Jonathan and a sister Jessica. Like Jessie, they too are law enforcement officers. His uncle, his father's twin, is also a law enforcement officer and the three cousins plus Jessie and his siblings are the second generation of law enforcement officers in a family committed to serve. Jessie attended Christopher Columbus High School and was a standout athlete, but his passion and dream was always to follow in his father's footsteps to pursue a career in law enforcement. So right out of high school he entered Broward Community College Police Academy. In 2007, he graduated and at the age of 19 he began his career as a road patrol officer. By 21, he graduated from SWAT school and became one of the youngest members of the SWAT unit. He responded to hundreds of SWAT calls and was one of six men with the Crime Suppression Team. His team responded to in progress calls for the most violent crimes in the city. Ultimately, he earned the title as team leader and SWAT training coordinator. As this court is undoubtedly aware from years in the criminal justice system, the SWAT officers are the first responders to the most serious and dangerous situations. As a SWAT officer, and as team leader, Jessie was always the first one through the door into unknown danger. Any officer who has been part of SWAT will tell you the seriousness of that first breach into a premises and that you could very likely be bursting into a room to have someone open fire onto



you and your team. 6 years into his career and at the young age of 25 Jessie was promoted to Sergeant. Having learned from his 3 years with the Crime Suppression Team he was considered a very proactive Sergeant- an unusual trait for a Sergeant. As a supervisor, Jessie was a mentor to the officers he worked with and rewarded and motivated them by creating a top cop award. He purchased an award with his own money to honor the officer that went above and beyond each and every month. His role as a Sergeant was, however, short lived because after 2 years as a Sergeant in 2015 he was relieved from duty due to the allegations contained in this case. While he was relieved from duty, and due to his proactive work in April of 2015[1], he was nominated as Officer of the Year for his role in taking down a human trafficking ring. One month later, the very first accusation arose. In July of 2016, after a thorough investigation by Detective Penate from the City of Hialeah Police Department Professional Compliance Unit and a full and complete review by the State Attorney's Office at the highest levels, it was determined that no charges should be brought against the Defendant due to the lack of any corroborating evidence to support the allegations made by individuals that only came forward once the news stories broke. Jessie was returned to duty as a patrol Sergeant where he remained for 3 years without incident until the indictment in this case in December 2019.

## A SUMMARY OF THE 71 LETTERS OF SUPPORT
### "THIS IS THE JESSIE WE KNOW"

Many of the attached letters come from pillars in our community. Many have served themselves either in law enforcement, or as firefighters, or in the military. But they come from all walks of Jessie's life- from officers or friends he has mentored or cared for or worked beside to childhood friends and people he has met in the gym or just neighbors next door.

---

[1] He was relieved from duty in June of 2015 due to the allegations from the victim listed as relevant conduct in the PSR. The three victims making up the counts of conviction came forward after the news stories about the Defendant came out. His actions in this case for which he was indicted and plead involve three instances that occurred over a 7-month period of time.



Jessie is often described as a "gentle giant" due to his athletic build and large stature. He is 6 feet 3 inches and weighs 260 pounds. But it is his kind, giving, and generous nature that earned him the gentle part of that title. As many of the 73 people who have submitted statements of support for Jessie can attest, he is often the first person to help anyone in need. That is just who he is. He is described as "someone you can count on" who gives "so much to those around him". There are countless stories of selfless acts by Jessie: helping a woman he saw trying to drag her sofa to her front lawn; donating clothes to mentally ill patients in a treatment center or sometimes just visiting with them to let them know someone cares; providing a meal or cup of coffee to a homeless person or assisting stranded motorists to help fix a flat. He never misses an opportunity to help.

For those that worked with him or for him or simply watched his career progress he is described as someone who is passionate about law enforcement. There are examples of him providing free training to law enforcement so that they are safer and provide better quality of service to the community. A local attorney describes "tactical Tuesday's" at the Menocal International Training (MIT) as an affordable option for law enforcement to pursue the training their department do not provide. He comments of Jessie's "conscious choice to forgo the money in exchange for accessibility". One retired officer shared a story about how Jessie helped him after a police shooting to make sure his mental health was addressed and that he was managing the trauma well. Many echo that Jessie was born and brought up to be a dedicated servant and that the loss of his lifelong dream and his career is devastating not just to him and his family but to our community. A repetitive theme about his work as a law enforcement officer includes terms like "dedicated", "driven", "striving to do more" "strong work ethic", "professional". Over the past several years he has organized at least 5 fundraisers for officers who have been injured, many for officers he did not even know. As recently as this past weekend, even with this sentencing



looming, he put together a fundraiser (one he could not even attend because of his bond restrictions) for an officer involved in a motorcycle accident in order to help his wife with hospital bills and the long road of recovery ahead. See attached flyer as Exhibit C. However, his fundraising efforts are not limited to law enforcement. He provides free classes to teachers and health care professionals in our community because he is a "thoughtful and compassionate, generous and supportive person" and because his entire goal is "to make our community safer". He has organized several toy drives, participated in turkey drives, organized fundraisers for breast cancer awareness. Anything to help his community and those in need. Many describe him as having a "huge heart".

He is described as a "dedicated parent" a "devoted" "present father" who does homework with his kids, who goes to every game or recital. There are examples of him doing hair and nails and costume changes at his daughter's dance recitals or coaching his son's team and offering advice about sportsmanship and the need to be your best and to always be willing to learn and help lift up others. He takes pride in raising his kids and teaches them to respect everyone and wants his kids "to be good respectful human beings". A resounding theme throughout the letters is that he is a good man, husband, son, brother, friend but above all a great father. If you ask Jessie, he will tell you that is because he had a great example- his father. Many describe him as having a "strong sense of duty- to family and to his community". All are concerned about his absence and the toll that will take on his kids. It is often an argument of defense counsel that incarceration of a defendant will adversely affect the children. In response to such an argument, one southern district court judge remarked "unfortunately, it is not just childless people who commit crimes." Certainly, a fair counter point, but the family of a defendant certainly qualifies as "history and characteristics" worthy of consideration under the 3553(a) factors. In this instance the offenses of conviction



occurred nearly seven (7) years ago. Jessie's children have grown up with this case looming over their household and at their current ages the absence of their father will be even more traumatic.

Without fail, almost every person who wrote a letter to this court describes their shock upon hearing about his arrest, indictment and/or plea. Many are shocked and surprised because it is "contrary to the person I know". One writer states, "it is difficult to reconcile the person I know with these charges". That sentiment is repeated throughout because of Jessie's years of service and for that reason everyone asks this court to consider more than just the offense because "this case is not a reflection of who he is" and to "consider all aspects not just this specific moment in time". That Jessie Menocal is "far more than the offenses presented before the court". Many ask the court for leniency because "he has more to do" "more to give" and many have witnessed his "growth, perseverance and choices for creating a better horizon for himself, his family and our community". Why are so many honorable people willing to stand up for Jessie Menocal? One writer puts it beautifully, "I attest to [his] commitment to always be willing to help and be there for others and this is why I write this letter to help him in return". He has earned the respect of so many in our community and that is a factor this court should consider when determining what is a sentence that is sufficient but not greater than necessary.

Many commented that Jessie is "extremely remorseful and embarrassed" about his conduct and that he is cognizant that he "betrayed the badge and brought pain to his family and everyone involved." There is a lot of discussion about second chances but mostly the letters reflect everyone's consistent belief that Jessie is good at his core and that he will do whatever is necessary to make the appropriate reparations and lead a life of honor as he has done for the overwhelming majority of his life. All of the people presenting themselves to this court on Jessie's behalf ask the court to "take into consideration all the good he has done". Retired Officer Harold Garzon provides insight into the job of a law enforcement officer including the stressors and pressures



placed on those who serve. He offers this information not to excuse conduct by officers but more to explain, "[S]ome people are better equipped to deal with this life choice, but we all do eventually fall at one point or another. After all, we are human". A friend and colleague who worked alongside Jessie at the Hialeah Police Department wants this court to know that Jessie Menocal is "not a man who underestimates his wrongs" and that he "takes them more seriously than his rights." Many discuss the personal toll this case and the media coverage have taken on Jessie and his family but have also witnessed firsthand how Jessie "has shown determination for personal growth" and how Jessie is "ready to move forward and be an honest, hardworking, and valuable citizen in our community". Counsel could not say it better than Dr. Alberto Dominguez-Bali "[T]hrough life, it is the getting up when you are down and the vision of future goals that keeps one alive."

### THE FACTORS IN 18 U.S.C. §3553 SUPPORT MENOCAL'S MOTION FOR A DOWNWARD VARIANCE

Post *Booker* the court is required, pursuant to 18 U.S.C. §3553 to impose a reasonable sentence that is sufficient, but not greater than necessary. In doing so the court must take into consideration the need for the sentence imposed to:

> Reflect the seriousness of the offense, to promote respect for the law and provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the Defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(1)-(7) then provides the court with the context in which to consider the above factors stating that in "determining the particular sentence to be imposed," the court must consider the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense.



A.  The Seriousness of the Offense, Respect for the Law, and Just Punishment can be Achieved Through Means Other than Incarceration.

It is all too common in the criminal justice system for courts and prosecutors to presume that a term of imprisonment is the only way to reflect the seriousness of an offense and provide just punishment. Nothing could be further from the truth. Punishment exists in many forms. As many of the letter's attest, Jessie was born to be a law enforcement officer.  He grew up wanting nothing more than to fulfill his dream of following in his father's and Uncle's footsteps. A dream that led him to an exemplary career filled with many rewards and commendations for his hard work and effort. That lifelong dream and passion is now gone. As part of his plea, Jessie Menocal surrendered and abandoned his Florida Department of Law Enforcement Certificate and agreed to never apply for a new law enforcement certificate in any jurisdiction- ever.  Even a brief reading of the attached letters is enough know just how much that means.  There is only one thing this court can do to punish Jessie Menocal even more and that would be to take him away from his family.  The government's insistence on this condition as part of any resolution is further indicative of just how punitive they consider it. Furthermore, this case for Jessie Menocal began back in 2015 when he was first relieved from duty.  He and his family have suffered the consequences of his actions for 7 years.  The many news stories and exposes were brutal and, in many instances, untrue. They attacked not only him, but his entire family too.  The Menocal name was dragged through the mud.  This is a strong and resilient family and together they have persevered, but to say that this has not been a form of punishment would not be a true statement. Jessie has had to live with threats to himself, his wife, and kids without the ability to protect his family. Despite all our efforts, even with the insistence of this court, undersigned counsel and



law enforcement have been unsuccessful in removing damaging and harmful material from social media. This will be a lifelong issue and concern for Jessie Menocal as social media is there forever even when Jessie's payment and debt to society through this court's sentence is long gone. Finally, as of the writing of this memorandum Jessie Menocal has filed his 30th report with pretrial services without a single issue or concern. Many of the delays in this case are the result of a worldwide pandemic as well as Jessie's own substitution of counsel. Yet, it is a fact worth consideration by this court. Jessie's life has been on hold for 2 ½ years since his arrest in this case. His work has been restricted and he was forced to retire from Menocal International Training, Inc. Only recently, with this court's permission was he able to assist his father after his cancer diagnosis with driving and setting up courses at the range. Many of the letters attached and outlined above talk about how dedicated he was toward furthering the community through tactical training and his superior skills in that area. He taught not only in his family business, but also was a contract employee with the Department of Justice to train the national police in Colombia. Through MIT he taught nurses at Baptist Health to educate and train them on workplace violence. Through the NRA and programs with NOVO arms he taught at an all-female program focusing on situational awareness and defensive tactics. He worked off duty at Citrus Health and a letter of appreciation is attached from 4 employees that he worked with who witnessed his kindness with patients. He taught youth firearms safety and participated in anti-bullying efforts. All of this has been on hold during the pendency of this case. For 30 months, his freedom has been curtailed, he has been unable to work in his desired field, he has faced public humiliation the likes many of us have never seen, he has given up his career and lifelong dream and he has had to endure harmful threats to him and his family at the hands of those


RATZAN & FACCIDOMO LLC
2850 Tigertail Avenue, Suite 400, Miami, FL 33133
Tel. 305.374.5730
Fax. 305.374.6755
www.rflawgroup.com

wishing to hide behind the internet. The stress has been incredible, and it has been mentally, spiritually and financially devasting to Jessie and his family. In United States v. Samaras, 390 F. Supp2d 805, (E.D. Wise.) the court held that "[t]he guideline range after departure was 30-37 months, but... this [was] greater than necessary to satisfy the purposes of sentencing." *See, e.g.*, United States v. Page, No. 04-CR-106, 2005 WL 2076710, at "4-5, 2005 U.S. Dist. LEXIS 19152, at *12 (E.D.Wisc. Aug. 25, 2005); barium, 353 F.Supp.2d at 990-91. United States v. Redemann, 295 F.Supp.2d 887, 894-97 (E.D.Wis.2003) (departing downward where defendant suffered serious collateral consequences from conviction). Certainly, Jessie has suffered his share of collateral consequences.

   B. A Sentence Of Incarceration For 36 Months As Recommended By The Government Is Greater Than Necessary To Provide The Adequate Deterrence To Criminal Conduct.

Courts have all too often prescribed to the failed equation of more prison equals less future crime. The empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. As stated more fully above, there is simply no evidence that increases in sentence length reduces crime through deterrence. Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

If prison does not equal deterrence as set forth above, then the purpose of prison is solely to punish. As stated above, punishment takes on many forms and in this case one would be hard pressed to argue that Jessie Menocal has not been punished. *See* United States v. Mateo, 299

F.Supp.2d 201 (S.D.N.Y. 2004) ("[T]here is more to the concept of just punishment and deterrence of the particular individual than the temporal and physical hardships imposed by a sentence as measured by the length of time in prison pre-specified by a guidelines range. In fact, beyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement.... In essence, the court's discretion to depart is a manifestation of the necessity for a just sentencing scheme to include provisions for that reasoned intuitive judgment, rather than a hard, deterministic formula, to governs the rare case.... The concept of what is, just punishment" thus contemplates a prospective, empirical assessment, necessarily imprecise, of the accumulation of reasonably foreseeable, ordinary hardships and suffering that any given offender is likely to experience in the typical case during the course of a particular range of imprisonment.") (Citations omitted).

Jessie has and will continue to suffer the consequences for his actions. To say that a prison sentence is the only punishment available is to discount the more painful and long-lasting punishments that Jessie will endure in perpetuity. Prison will end, but the disappointment and shame that Jessie has brought upon himself, and his family is forever.

### C. Jessie will *Never* Commit Another Offense.

Jessie Menocal is a 34-year-old, educated, married, first time offender with absolutely no criminal history, and no history of drug or alcohol abuse. He has incredible family and community support and has lived an extraordinary and exemplary life of service to others. All these attributes



strongly suggest that he is at minimal risk to recidivate. Of all of the purposes of sentencing, the need to protect the public from further crimes of the defendant is the one of greatest practical concern, and also the most capable of being measured. This purpose has to do with both the defendant's risk of recidivism and the danger posed by the defendant, if any. It "is particularly important for those offenders whose criminal histories show repeated serious violations of the law." S. Rep. No. 98-225 at 76 (1983). It is not so important for first offenders that have little risk of recidivism.

The Sentencing Commission has released three studies on recidivism: *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004),[2] *Recidivism and the First Offender* (May 2004),[3] and *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4, 2005).[4] It also discusses the risk of recidivism for certain career offenders in its Fifteen Year Review. The studies show that the following factors, which the guidelines prohibit or discourage, correlate with reduced recidivism:

> Age: Age is a powerful component of recidivism prediction, which the Guidelines do not take into account. "Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.
>
> Employment: Stable employment in the year prior to arrest is associated with a lower risk of recidivism (19.6%) than for those who are unemployed (32.4%).
>
> Education: Recidivism rates decrease with increasing educational level (no high school (31.4%), high school (19.3%), some college (18%), college degree (8.8%).

---

[2] Available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

[3] Available at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf.

[4] Available at http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf



Family: Recidivism rates are lower for defendants who are married (13.8%) or were married but are divorced (19.5%) than if never married (32.3%).

Abstinence from drug use: Recidivism rates are lower for those without illicit drug use in the year prior to the offense (17.4%) than those who used illicit drugs in the year prior to the offense (31%).

Finally, offenders like Jessie, with zero criminal history whatsoever, have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, *Recidivism and the "First Offender"* at 13-14 (May 2004). *See, e.g.,* United States v. Darway, 255 Fed. Appx. 68, 73 (7th Cir. 2007)(upholding downward variance on basis of defendant's first offender status); United States v. Urbina, 2009 WL 565485 (E.D. Wis. Mar. 5, 2009)(considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history and strong family ties); United States v. Cabrera, 567 F.Supp. 2d 271,279 (D.Mass. 2008)(granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); United States v. Ward, 814 F.Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense.).

Even the Government would be hard pressed to argue it is concerned about Jessie Menocal committing another crime. Their plea agreement in this case all but says that. The Government permitted Jessie Menocal to plea to three (3) misdemeanors knowing that if he was convicted at trial, he would be facing guidelines of almost 30 years to life. Again, the court need only review a few of the attached letters to know that recidivism is not a concern in this case with this Defendant. Finally, this crime as defined by 18 U.S.C. Section 242 can never be committed by this defendant ever again as he will no longer be a law enforcement officer. As such, the need to



incarcerate the Defendant to protect the public from future crimes is not a legitimate concern and should warrant no further consideration by this court.

   D. Jessie Menocal Has Led An Exemplary Life Of Service Except For The Brief And Aberrant Conduct In This Case

The facts and circumstances surrounding the three instances set forth in the Second Superseding Information and that resulted in the defendant's plea are from 7 years ago. At that time Jessie Menocal had been a law enforcement officer for 8 years and had been promoted to Sergeant and was nominated for Officer of The Year for his proactive role in taking down an ongoing Human Trafficking ring in Hialeah. He had never been previously accused or disciplined by his department for any sexual wrongdoing. The facts in this case are from a brief period in his 13-year law enforcement career. The 3 encounters span a 7-month period. As stated above, once the State Attorney's Office reviewed these very same allegations and declined to prosecute in large part because there was no corroborating support for witnesses, they deemed not to be credible, Jessie Menocal returned to duty. As a patrol officer in the very same and surrounding sector for the next 2 plus years he served without a sexual assault complaint or allegation. Stated another way, Jessie Menocal was a police officer for 13 years. As the court is aware, the government was thorough, dutiful, and diligent in its investigation of this case tracking down nearly every encounter the Defendant had during his time with the Hialeah Police Department. The criminal offenses for which he has been convicted took place during the 7 month period. He never had any complaints prior or since when he was reinstated to duty. In addition to his law enforcement activities, he provided tactical training to a number of women through Baptist Health System, Menocal International Training, and the NRA program Women on Target. He worked off duty at Hooters



and Citrus Mental Health. All during the same relevant time period and all without issue, complaint, or allegation.

Contrast this with a lifetime of positive work both in and out of law enforcement, the behavior is truly "aberrant". That is why so many of the attached letters ask this court to look at all aspects of his life, not just this one specific moment in time which is truly a blemish on an otherwise exemplary record of service and sacrifice. Jessie Menocal has shown through his actions before and after this crime that he has the moral conviction to be a positive member of society. His willingness to admit his wrongdoing to this court, but also to change his behavior reveal a man capable of redemption See United States v. Howe, 543 F.3d 128 (3rd Cir. 2008)(variance based on "isolated mistake" in otherwise long and entirely upstanding life).

E. The Court May Properly Consider the Need to Pay Restitution and the Defendant's Unique Family Circumstances and the Need to Maintain Employment.

In addition to losing the only career he has ever known Jessie Menocal was unable to work in his family business during the pendency of this case (this December will be 3 years). As stated above and shown in the letters attached hereto, this has devastated his family in many ways, but one of them has been financially. As shown in the PSI, Jessie Menocal is almost destitute. But for the loving financial support from his parents and his wife's parents he and his wife and kids would have been out on the streets. His parents have supported his family paying for their mortgage, their bills even his attorney's fees. He has nothing and he has to start from zero to rebuild his life and financial future. To make matters worse, in November of 2021, Jessie's father, hero and provider for his family was stricken with Non-Hodgkin's Double Hit Lymphoma. He is currently undergoing aggressive chemotherapy and radiation that attacks the

RATZAN & FACCIDOMO LLC

2850 Tigertail Avenue,
Suite 400, Miami, FL 33133
Tel. 305.374.5730
Fax. 305.374.6755

www.rflawgroup.com

disease but also attacks the good cells in the body and wreaks havoc on an otherwise healthy person. Jessie has been by his father's side since his diagnosis doing what he always has done as a son- offering love and support. But he has also been his father's primary caretaker taking him to doctor appointments and creating a wellness routine to keep his body and mind strong for the upcoming battles he will face. Moreover, given his father's age and the severity of his disease, a sentence as requested by the government could very well mean that in court the day of the sentencing may be the last time Jessie sees his father not behind glass. While there are others to care for Jessie Sr. it was Jessie who took over and advanced Menocal International Training before this case came around. Furthermore, with his father's illness if Jessie is not around to assume that role the family business could be at risk. An alternative incarceration sentence- halfway house followed by home detention, will permit him to work to keep his family business alive during these very difficult times. Furthermore, as evidenced by the many letters, Jessie is the center of his children's lives. He is the parent that takes them to school, to practice and is the one doing homework pushing them to succeed. An alternative incarcerative sentence as described above will keep him in his children's lives at a time when they need him the most. Additionally, this court will be reserving on restitution, but that matter will end up before this court at a later date. Incarcerating Jessie serves no end, and yet allowing him to serve a sentence but in a halfway house setting, will allow him to help his father in his time of need, remain an active and present father for young children who need him, and work to pay whatever restitution is ultimately ordered by this court. The career Jessie cherished is now over. His challenge is to pick of the pieces and move forward to demonstrate to this court, the government, the community, and his family his character and to pay back society for his wrongs.



RATZAN & FACCIDOMO LLC
2850 Tigertail Avenue,
Suite 400, Miami, FL 33133
Tel. 305.374.5730
Fax. 305.374.6755
www.rflawgroup.com

**CONCLUSION**

The government has requested in their sentencing memorandum (DE: 118) that this court give Jessie the maximum possible sentence. In doing so they argue that the applicable guideline range, but for the 1-year statutory maximum, is up to life. That is a false metric not worthy of this court's consideration. The government assessed the facts and the case, and an appropriate resolution was reached. Asking for the court to sentence a defendant, with no prior criminal history, to the maximum allowed by law as a means of attempting to compensate for the very cap they negotiated is misguided. The advisory guideline range in this case is a maximum of 36 months if all three 12-month statutory maximum sentences are to run consecutive. With the facts, arguments and exhibits attached to this memorandum as well as the arguments of counsel and witnesses at sentencing, undersigned counsel believes a variance from that advisory guideline range is appropriate and deserved. The result of the variance is a sentencing range anywhere from 0-36 months as the statute controls and permits a sentence of probation. Jessie Menocal lived a life of good deeds with service to his community, to his family and often to anyone in need. He, of his own doing during a 7-month period of an otherwise exemplary 13-year career, has lost his reputation, his dignity, and his career.  He has already paid a heavy price over these past 7 years. More than anyone, he holds himself accountable and has acknowledged his guilt and wrongdoing before his entire community. What he and his family and the 73 people who submitted attestations to this court humbly ask is for this court to weigh his wrongdoings with what he got right in his life and give him a second chance to prove himself worthy- a chance at redemption.

**WHEREFORE**, based on the forgoing reasons and additional argument to be made at the time of sentencing Jessie Menocal respectfully requests this court to enter an alternative



incarcerative sentence that comports with 18 U.S.C. § 3553(a)(2) as "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

<b><u>CERTIFICATE OF SERVICE</u></b>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was eFiled with the Clerk of Courts by using the CM/ECF system which will send notice of eFiling to all counselors of records and interested parties this 9th day of May 2022.

Respectfully submitted,

RATZAN & FACCIDOMO, LLC
ATTORNEYS AT LAW
2850 Tigertail Avenue
Suite 400
Miami, Florida 33133
305 374-5730
305 374-6577
mycki@rflawgroup.com
jude@rflawgroup.com

By: /s/ *Mycki Ratzan*
MYCKI RATZAN, ESQ.
Florida Bar No. 915238

By: /s/ *Jude M. Faccidomo*
JUDE M. FACCIDOMO, ESQ.
Florida Bar No. 0012554

